UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO
ALBUQUERQUE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO: 1:17-MJ-02008-WPL-1 |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Albuquerque, New Mexico |
| | ) | |
| DULCE ISABEL RAMOS-BURCIAGA, | ) | Tuesday, August 8, 2017 |
| | ) | |
| Defendant. | ) | (10:06 a.m. to 10:35 a.m.) |


PRELIMINARY EXAMINATION HEARING

BEFORE THE HONORABLE WILLIAM P. LYNCH,
UNITED STATES MAGISTRATE JUDGE

**APPEARANCES:**

For Plaintiff:             KYLE NAYBACK, ESQ.
                          U.S. Attorney's Office
                          District of New Mexico
                          P.O. Box 607
                          Albuquerque, NM 87103

For Defendant:             ALEJANDRO B. FERNANDEZ, ESQ.
                          Assistant Federal Public Defender
                          111 Lomas Boulevard NW, Suite 501
                          Albuquerque, NM 87102

Interpreter:               H. Orive

U.S. Pretrial/Probation: Adalinda Urias

Court Reporter:            Recorded; Liberty: Rio Grande

Clerk:                     C. Lopez

Transcribed By:            Exceptional Reporting Services, Inc.
                          P.O. Box 18668
                          Corpus Christi, TX 78480-8668
                          361 949-2988
Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

INDEX

| GOVERNMENT'S WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| JARRELL PERRY | 4 | 8 | | |

| | | |
|---|---|---|
| **ARGUMENT** | 23 | |

| | | |
|---|---|---|
| **RULING** | 26 | |

 1    **Albuquerque, New Mexico; Tuesday, August 8, 2017; 10:06 a.m.**

 2                          **(Call to Order)**

 3              **THE CLERK:**  The United States of America versus Dulce

 4    Isabel Ramos-Burciaga.

 5              **MR. NAYBACK:**  Again, Kyle Nayback for the United

 6    States, your Honor.

 7              **THE COURT:**  Great.  Thank you.

 8              **MR. FERNANDEZ:**  And your Honor, Alejandro Fernandez

 9    for Ms. Ramos.

10              **THE COURT:**  Sure.  And if you guys want, you can be

11    seated and I assume you have a witness you'd like to call?

12              **MR. NAYBACK:**  I do have a witness --

13              **THE COURT:**  Great.

14              **MR. NAYBACK:**  -- that I'd like to call.  His name is

15    Jarrell Perry.  He's a special agent with the DEA.

16              **THE COURT:**  Great.

17              **MR. NAYBACK:**  And I call him at this time, your

18    Honor.

19              **THE COURT:**  Great.  Thank you.

20              **MR. NAYBACK:**  Yes, sir.  Your Honor, may I have a

21    moment just to get situated?

22              **THE COURT:**  Of course.

23              **MR. NAYBACK:**  Thank you.  Okay.  Thank you.

24              **THE COURT:**  If I could ask you to raise your right

25    hand?

1          **JARRELL PERRY, GOVERNMENT'S WITNESS, SWORN**

2          **THE COURT:**  Okay.  Thank you.  Be seated please, sir.

3                        **DIRECT EXAMINATION**

4    **BY MR. NAYBACK:**

5    Q    Sir, when you get comfortable there, will you please state

6    and spell your full name for the record?

7    A    Yes.  It's Jarrell, J-A-R-R-E-L-L.  Middle name is Wayne,

8    W-A-Y-N-E.  Last name is Perry, P-E-R-R-Y.

9    Q    And sir, for whom do you work?

10   A    I'm a special agent with the Drug Enforcement

11   Administration here in Albuquerque.

12   Q    How long have you been doing that?

13   A    Next month will be 19 years.

14   Q    Are you familiar with the case involving an individual by

15   the name of Dulce Isabel Ramos-Burciaga?

16   A    Yes, sir, I am.

17   Q    Is she in the court room and if so would you please point

18   to her and describe her clothing?

19   A    She is in the court room.  She's seated here beside her

20   attorney.  She's wearing a red jumpsuit.  She has long curly

21   black hair.

22          **THE COURT:**  Your Honor, will the record reflect

23   proper identification of the defendant?

24          **THE COURT:**  Any objection?

25          **MR. FERNANDEZ:**  No, your Honor.

1          **THE COURT:**  So found.

2          **(Witness identified Defendant)**

3     **BY MR. NAYBACK:**

4     Q    Sir, where you working on August 4th of 2017?

5     A    At the Greyhound bus station here in Albuquerque, county

6     of Bernalillo in the state and district of New Mexico.

7     Q    Were there other agents with you?

8     A    Yes, there were two other agents.

9     Q    What were their names?

10    A    Special Agent Larry Pentowah (phonetic) and David Nutley

11    (phonetic).

12    Q    Can you describe for the court your encounter with the

13    defendant?

14    A    She was inside of the Greyhound bus station.  I walked up

15    to her, displayed my DEA badge to her, identified myself as a

16    police officer, asked for and received permission to speak with

17    her.

18    Q    And did she respond?

19    A    Yes, she did.  She did give me -- she did give verbal

20    permission to speak with her.

21    Q    Okay.  Now were you speaking Spanish or English?

22    A    I was speaking in English and I even asked her on one,

23    maybe two occasions if she spoke English okay, and she said,

24    yes, she did.  So my encounter with her was in English.

25    Q    Okay.  And during your encounter with her, did she

Perry - Direct / By Mr. Nayback                              6

1   communicate effectively in English with you?

2   A    Yes, she did.  She answered the questions appropriately

3   and responded appropriately to the questions that I asked

4   her --

5   Q    Okay.

6   A    -- in English.

7   Q    What kind of -- what kind of luggage did she have?

8   A    She had two pieces of luggage.  She had a black rolling

9   suitcase and then she had a black, I refer to it as a backpack,

10  she said it was a purse, but it was over her shoulders, had two

11  straps on it, it looked like a backpack to me.

12  Q    And did you ask her for permission to look in that

13  backpack --

14  A    I asked if --

15  Q    -- or purse?

16  A    Yes, I asked permission to actually search it.

17  Q    Okay.  And what was her response, Special Agent?

18  A    She didn't answer the question.  She asked me why and I

19  explained to her earlier why we work at the Greyhound bus

20  station and why I was asking permission to search it.  She

21  didn't answer the question.  I asked her twice.  So I asked her

22  if she would open up her backpack or purse to reveal the

23  contents to me.

24  Q    Okay.  And did she do that, Special Agent?

25  A    Yes, she voluntarily -- she made a statement verbally and

1    she took the backpack or her purse off of her shoulders and sat

2    it in her lap and opened it up and began to move the articles

3    around inside the -- very quickly in a nervous manner, in my

4    opinion, and then there was a pink colored, I refer to it as a

5    -- it might have been a wallet or like a makeup case.

6    Q    Sure.

7    A    I asked her if she could remove that so I could see the

8    contents.  She didn't take it out.  She moved it and then I

9    could see a black electrical-taped oblong, the top of an oblong

10   shaped bundle.  I knew immediately from my experience it was a

11   bundle of illegal narcotics that I'd seen on numerous

12   occasions.  At that time, the defendant was placed into

13   handcuffs and arrested.

14   Q    Okay.  After her arrest, where did you take her?

15   A    To the DEA Albuquerque District Office.

16   Q    Okay.  When you were there, did you conduct a search of

17   that (glitch in audio) that you were just referring to?

18   A    Yes, sir, I did.

19   Q    What did you locate?

20   A    There were actually two bundles, both wrapped in electric

21   -- black electrical tape, oblong in shape.  They were weighed.

22   They weighed approximately 1.40 gross kilograms.  We cut into

23   them.  They revealed a brown powdery substance that did field-

24   test positive for the presence of heroin.

25   Q    Did the defendant make any statements to you?

Perry - Cross / By Mr. Fernandez                    8

1   A    No, she did not.

2              **MR. NAYBACK:**  Pass the witness, your Honor.

3              **THE COURT:**  Thank you.

4              **MR. NAYBACK:**  Yes, sir.

5                       **CROSS EXAMINATION**

6   **BY MR. FERNANDEZ:**

7   Q    Agent Perry, you filed an affidavit in this case?

8   A    Yes, sir.

9   Q    And in that, you were detailing more or less what you

10  testified today; is that right?

11  A    I put basically the probable cause for the case in the

12  affidavit.

13  Q    Okay.  And in that affidavit, you described the initial

14  confrontation with Ms. Ramos?

15  A    I wouldn't refer to it as a confrontation.  I would refer

16  to it as a consensual encounter.

17  Q    Okay.  In that, you describe the initial encounter with

18  Ms. Ramos?

19  A    Yes, sir.

20  Q    And in that, you wrote similar to how you testified today

21  that you asked for her permission to speak?

22  A    Yes, sir.

23  Q    And then you talked about her travel a little bit?

24  A    Yes, sir, I did.

25  Q    Okay.  Now you didn't say that today.  What did you say --

Perry - Cross / By Mr. Fernandez                        9

1   what did you talk to her about her travel?

2   A     Basically where she was traveling to and traveling from

3   and where she lived.

4   Q     And was there anything in those answers that were

5   suspicious?

6   A     No, I wouldn't say so, no.

7   Q     Okay.  And you described today that there was a black

8   rolling suitcase?

9   A     Yes, sir.

10  Q     Okay.  Now you didn't mention that in your affidavit,

11  right?

12  A     I don't believe I did, no.

13  Q     Okay.  In your affidavit you said that your question to

14  her was whether or not she had any luggage?

15  A     Yes.

16  Q     And so you asked her if she had luggage?

17  A     Yes, sir.

18  Q     And she -- you asked that question when you were looking

19  at a black rolling suitcase?

20  A     No, I asked her that question when she was sitting inside

21  the station.  I wasn't looking at a black rolling suitcase.

22  Q     Okay.  So from where you were standing facing her and

23  talking to her, you couldn't see the black rolling suitcase?

24  A     I could not.

25  Q     Okay.  How far away from her was the black rolling

Perry - Cross / By Mr. Fernandez                    10

1  suitcase?

2  A    I'm not exactly sure.

3  Q    If you had to estimate?

4  A    Maybe a little farther from me to you.

5  Q    Okay.  So just so for the record, that's about 15 feet,

6  would you say?

7  A    I'm not very good at measuring that distance.  I don't

8  know how far it is.

9         THE COURT:  I don't know, 15 to 20 feet.  I have no

10  idea.

11        MR. FERNANDEZ:  Okay.  I just want the record to have

12  some estimation since that won't translate to a -- the record

13  wouldn't be able to pick up the distance that's physical.

14        THE COURT:  Right.  Right.  Correct.

15  BY MR. FERNANDEZ:

16  Q    So you'd agree that's about 15 to 20 feet?

17  A    I would -- I would estimate that, yes.

18  Q    Okay.  And was there anything standing in your way between

19  Ms. Ramos and that black suitcase that was about 20 -- 15 feet

20  away?

21  A    There was a pillar and some seats --

22  Q    Okay.

23  A    -- that are inside the Greyhound bus station.

24  Q    So the black suitcase was on the other side the pillar and

25  seats?

Perry - Cross / By Mr. Fernandez                    11

1   A    Yes, sir.

2   Q    Okay.  Did it seem as though anyone was standing with that

3   black suitcase other than Ms. Ramos, or was associated with

4   that suitcase?

5   A    I have no idea.  There were other passengers sitting

6   inside the bus station but I -- nobody was standing by it.

7   Q    Okay.  And so when you asked her whether she had luggage,

8   did she identify that suitcase?

9   A    Yes, she did.

10  Q    And who retrieved that suitcase?

11  A    Nobody retrieved it.

12  Q    Okay.  So as far as you remember, you never touched that

13  suitcase?

14  A    She gave me permission to search it, so yes, I did.  I

15  searched it.

16  Q    Okay.  So who went to get the suitcase?

17  A    She walked over and showed me her suitcase and then I

18  searched it right in that area.

19  Q    Okay.  So before you even got to the backpack, you

20  searched the suitcase, right?

21  A    Yes, sir.

22  Q    Okay.  You didn't mention that today.

23  A    No, it wasn't -- it didn't have anything to do with

24  probable cause so, no, I didn't.

25  Q    Okay.  So the conversation that you described with the

1    prosecutor today was actually not the manner in which it

2    proceeded?

3    A    No, I searched that suitcase prior to ask permission to

4    search her backpack or her purse.

5    Q    Okay.  And so when you first encountered Ms. Ramos, she

6    was sitting down?

7    A    Yes, she was.

8    Q    And she retrieved her suitcase from behind that pillar?

9    A    As I testified earlier, nobody retrieved it, she walked

10   over and identified it as being her suitcase.

11   Q    So she didn't touch it at that point?

12   A    I can't remember if she picked it up and sat it in the

13   seat or if I asked her permission to do that.  I can't

14   remember.

15   Q    Did she ever return to where she was sitting?

16   A    No, she sat down right beside where that black suitcase

17   was.

18   Q    On the floor?

19   A    No, in a seat.

20   Q    So there is benches near that pillar that you described?

21   A    Yeah, earlier I said there was a pillar and seats.

22   Q    Okay.  And so she didn't sit down in the same place that

23   you first encountered her?

24   A    No, sir.

25   Q    Okay.  And when you asked for permission to search the

Perry - Cross / By Mr. Fernandez                              13

1    suitcase, that was the first question you asked her with

2    respect to luggage?

3    A    I asked her if she had any luggage with her.  And she said

4    yes and I asked her where it was located.

5    Q    And --

6    A    And that's when she walked over and identified that black

7    rolling suitcase.

8    Q    Okay.  And who did the search of that suitcase?

9    A    I did.

10   Q    And you described Mr. -- Officer Pentowah and Officer

11   Nutley were also there?

12   A    Yes, they were.

13   Q    Where were they located with respect to that search of the

14   suitcase?

15   A    I'm not exactly sure where Agent Nutley was.  Earlier he

16   was sitting in a seat inside the station.  When I started the

17   search of the black suitcase, Agent Pentowah walked up and

18   stood behind the seats where Ms. Ramos was seated.

19   Q    So there's an agent seated behind Ms. Ramos; is that

20   right?

21   A    No.  He stood behind --

22   Q    Okay.

23   A    -- where she was seated.

24   Q    I see.  And that was as you were asking her questions?

25   A    No, that was as I was searching the -- her black suitcase.

1  Q    And when you asked for permission to search the suitcase,

2  did you say what you were looking for?

3  A    Yes, for contraband.

4  Q    And you said it was a routine search, right?

5  A    I don't believe I ever testified to anything about a

6  routine.

7  Q    No, I'm asking, did you used those words.  It was -- you

8  told her it was a routine search?

9  A    I never said it was a routine.

10 Q    She asked you why do you want to search, right?

11 A    That was for her backpack, the black backpack.

12 Q    We're going to get to the backpack, but with respect to

13 the suitcase?

14 A    I don't believe she asked me about why I wanted to search

15 the suitcase.  She may have but I don't remember that.

16 Q    Okay.  So you never used the words, "This is a routine

17 search"?

18 A    No, I explained to her that due to the lack of security at

19 the Greyhound bus station, that we would talk to passengers at

20 the Greyhound bus station for security reasons.  I told her

21 that earlier and then I told her -- I told her that when I was

22 asking -- she asked me why I wanted to search her backpack, so

23 she was told on, I believe two maybe three occasions.

24 Q    You told her the same information on two or three

25 occasions?

1   A    Yes.

2   Q    Okay.  Did it appear as though she didn't understand the

3   first time?

4   A    No.  She didn't appear to that to me at all.

5   Q    Okay.  Now, it was after you searched the suitcase that

6   you asked her to search her backpack?

7   A    Yes, I asked her if she had any other luggage with her and

8   originally she said,  "No."  Then I asked her about the

9   backpack that was on her back.  She said that was hers but she

10  referred to it, I believe, as a purse.

11  Q    Wait, when you said -- she said no to having luggage, is

12  that what you just said?

13  A    Yes, I asked her if she had any other luggage with her --

14  Q    Oh, any other luggage.

15  A    -- and she said,  "No."

16  Q    Okay.  And when you asked her if she had any other

17  luggage, that backpack was on her shoulders?

18  A    Yes, it had two straps on it, it was both -- over both

19  shoulders and was lying on her upper back.

20  Q    So what did you think she would answer if you asked her if

21  she had any other luggage?

22  A    That if she had any other luggage.

23  Q    Okay.  And so you saw a backpack on her back?

24  A    Yes, sir.

25  Q    And did you take it off her shoulders or did she?

1  A    She did.

2  Q    And that was because you asked her to?

3  A    No, I asked her if she would open up her purse or -- as

4  referred to, or her backpack, to reveal the contents.  And

5  that's what she did.

6  Q    And now you wrote that when you asked her to do that, she

7  actually remained quiet, right?

8  A    I don't believe -- unless I put something in there that I

9  don't remember, I don't believe anything about me putting the

10  word "quiet" it my complaint.

11  Q    You wrote, you asked her permission from Ms. Ramos-

12  Burciaga, to search her black colored backpack for contraband.

13  She -- Ms. Ramos- Burciaga did not answer the question.  So

14  when I said, "remained quiet," I meant to remind you of those

15  words, "did not answer the question."

16  A    Yeah, that's two different statements.

17  Q    Okay.  So she did not answer your question?

18  A    She didn't answer yes or no.

19  Q    Did she answer in any way?

20  A    She asked me why, as I testified.

21  Q    So she did answer your question?

22  A    No, she didn't answer the question for giving me

23  permission to search it or not.  To me, that's not answering

24  the question.  That's either a yes-or-no question.  All she

25  said was,  "Why?"  She asked me a question.  She didn't answer

1   the question.

2   Q    Okay.  So what did you answer her when she said,  "Why"?

3   A    As I testified to earlier, that we checked the bus station

4   for security reasons and basically to confirm that she didn't

5   have anything illegal inside of it.

6   Q    And you used the word "contraband"?

7   A    I believe I used the word "illegal."  Anything illegal

8   inside of her purse or backpack.

9   Q    Okay.  Now was there any point at which the backpack that

10  you said was on her shoulders, not on her shoulders other than

11  after you -- after she took it off?

12  A    I --

13  Q    Let me rephrase the question.

14  A    I don't understand the question.

15  Q    Let me step back.  How long before you approached

16  Ms. Ramos-Burciaga were you watching Ms. Ramos-Burciaga?

17  A    I don't -- I don't really understand your question.

18  Q    How long before you approached Ms. Burciaga had you

19  noticed Ms. Burciaga sitting there?

20  A    She was sitting in a -- there was like a -- some type of a

21  game, like a Atari, like some type of a game that has -- was in

22  -- she was sitting in that seat.  Earlier when she walked

23  inside the station, she was sitting in a different seat.  So I

24  don't know how long she was sitting in that seat when I

25  approached her.

Perry - Cross / By Mr. Fernandez                    18

1   Q    Okay.  So did you know -- let's try to pin down times.

2   About when did you arrive at the bus station that evening?

3   A    I don't remember.

4   Q    At all?

5   A    It was at night.  I don't remember what time it was.

6   Q    Was already dark outside?

7   A    Yes, sir, it was.

8   Q    So after 8:00 p.m.?

9   A    It was after 8:00 p.m., yes.

10  Q    Do you recall around when Ms. Burciaga -- Ms. Ramos-

11  Burciaga walked into the station?

12  A    I don't know the exact (glitch in audio)

13  Q    When she walked in, were you inside the station or outside

14  the station?

15  A    I was outside the station when she walked inside the

16  station.

17  Q    So you saw her walk in?

18  A    Yes, I did.

19  Q    Okay.  Did you see her -- where she was coming from?

20  A    She got off the bus that just arrived.

21  Q    You saw her get off the bus?

22  A    Yes, sir, I did.

23  Q    Did at any moment you see her inside the bus?

24  A    I couldn't hear what you said.

25  Q    Were you ever inside the bus?

1   A    I wasn't inside of that bus, no.

2   Q    Were there any officers inside the bus?

3   A    Not to my knowledge.  I don't believe -- I don't know

4   unless someone was traveling on the bus that was an officer

5   that I don't know about.

6   Q    I just wanted to make sure that we're on the same page.

7   You didn't see her inside the bus?

8   A    I'm sorry?

9   Q    You didn't see her inside the bus?

10  A    No, I didn't see her inside the bus.

11  Q    But you did see her coming off the bus?

12  A    I saw her get off the bus and walk into the station, yes.

13  Q    Okay.  About how far from the bus to the station is it?

14  A    I'm not exactly sure.

15  Q    Okay.  After she walked in -- well, is it more or less

16  distance -- more or less the distance from where you and I are

17  standing?

18       **THE COURT:**  You know, this is interesting but

19  irrelevant to the issue of probable cause.

20       **MR. FERNANDEZ:**  Well, your Honor, he testified that

21  there was a piece of luggage 15 to 20 feet away from her behind

22  a pillar.  I need to know at what point he realized that there

23  was a luggage -- a piece of unattended luggage which lends some

24  credence  to the idea that he would ask her why -- whether or

25  not she had luggage.

1          What doesn't make sense is that he would ask someone

2    that -- whether or not they have luggage that has luggage on

3    them.  I want to know if the backpack was attenuated from

4    Ms. Ramos-Burciaga as this piece of rolling luggage is.

5          **THE COURT:**  The backpack that's on her back, you want

6    to know if that's attenuated as a rolling suitcase 15 to 20

7    feet away?

8          **MR. FERNANDEZ:**  I want to know if that was

9    credible --

10          **THE COURT:**  How could it be attenuated if it's on her

11    back?  I mean, I'm just -- this is a probable cause --

12          **MR. FERNANDEZ:**  Well, this goes to the credibility of

13    the testimony.

14          **THE COURT:**  Counsel?

15          **MR. FERNANDEZ:**  I'm sorry.

16          **THE COURT:**  Do not interrupt me.  Do you understand

17    how that works?

18          **MR. FERNANDEZ:**  Yes.

19          **THE COURT:**  Then don't do it again.  You know better

20    than that, don't you?

21          **MR. FERNANDEZ:**  Yes, your Honor.

22          **THE COURT:**  This is a probable cause hearing.  We're

23    not here for discovery.  If you don't want to ask about

24    probable cause, sit down.  I'm not going to allow you to go

25    wandering around.

Perry - Cross / By Mr. Fernandez                    21

1              **MR. FERNANDEZ:**  May I proceed?

2              **THE COURT:**  If you proceed on something that's

3    relevant to probable cause, yes.  If not, you're done.

4              **MR. FERNANDEZ:**  Very well.

5    **BY MR. FERNANDEZ:**

6    Q    When you -- when you entered the bus station, you saw

7    Ms. Ramos-Burciaga sitting down at a video console?

8    A    No, she was -- as I testified earlier, she was sitting in

9    a different seat.  Later on when I went back into the bus

10   station, she was sitting at that type of a computer game or

11   whatever it's called.

12   Q    And was she wearing her backpack at that point?

13   A    Yes, she was.

14   Q    At any point did you see her not wearing that backpack?

15   A    No, I did not.

16   Q    Okay.  So she was wearing the backpack for the entire

17   period of time that she was -- you saw her?

18   A    When I saw her, yes.

19   Q    Okay.  Now, when you searched the backpack, well the first

20   search of the backpack, she had done it herself?  She was

21   moving the items for you?

22   A    I never searched the backpack until after she was

23   arrested.

24   Q    Okay.  You noticed the bundle in the backpack while she

25   was moving things?

Perry - Cross / By Mr. Fernandez                          22

1   A    Yes, sir, I did.

2   Q    And that was -- withdrawn.

3        Was there any pieces of identifying material in

4   the backpack, an ID, anything with her name on it?

5   A    Yes, she had a Mexican passport with her name on it inside

6   of that purse or backpack.

7   Q    And did you retrieve that before or after it was back in

8   the station?

9   A    She had actually showed it to me earlier when I asked her

10  if she had identification with her.  She showed it to me at the

11  bus station.  Then I retrieved it at the DEA office.

12  Q    Is that before or after asking her to manipulate the

13  contents of the backpack?

14  A    I never asked her to manipulate the contents, I asked her

15  if she could remove them so I could reveal if there's anything

16  illegal inside.  And I took the ID out at the DEA office.

17  Q    Very well.  And for the entire time that you were watching

18  Mr. Ramos-Burciaga, she appeared alone?

19  A    Well, when you say watching her, I wasn't watching her the

20  entire -- I don't know what the question means but I saw her on

21  a couple of occasions and then when I walked up and talked to

22  her, she appeared to be alone, yes.

23  Q    Okay.  And on those couple of occasions prior, she was

24  also alone?

25  A    I never saw her with anyone else.

Perry - Cross / By Mr. Fernandez                    23

1   Q    Okay.  Did you see anyone make contact with her backpack?

2   A    No, I did not.

3   Q    Other than her obviously.  And did you see anyone stand by

4   or touch her rolling black suitcase?

5   A    No, I did not.

6   Q    Okay.

7        **MR. FERNANDEZ:**  I have no further questions, your

8   Honor.  Thank you.

9        **THE COURT:**  Thank you.  Any redirect?

10       **MR. NAYBACK:**  No, sir, your Honor.  Thank you.

11       **THE COURT:**  Thank you, sir.  You may step down.

12       **THE WITNESS:**  Thank you.

13     **(Witness steps down)**

14       **THE COURT:**  Do you wish to present any testimony or

15   just argument?

16       **MR. FERNANDEZ:**  Just argument, your Honor.

17       **THE COURT:**  You may proceed.

18       **MR. FERNANDEZ:**   Your Honor, I would argue that

19   Officer Perry's testimony was substantially different when on

20   cross examination as opposed to direct examination.  He

21   completely left out the portion of time in which he was

22   occupied with the rolling black suitcase in which he said it

23   was 15 to 20 feet away.

24       The subsequent question when he asked whether or not

25   she had any luggage is now in a different light.  If she was in

1    fact wearing the backpack, the question of whether or not it's

2    credible that he  would asked her if she had any luggage is a

3    very real concern.  It's not a normal question to ask someone

4    if they have any luggage if it's actually on their person.

5           It makes more sense that both the rolling backpack --

6    the rolling suitcase and the backpack were not in fact on her

7    person.  That would lend credibility to the question, "Do you

8    have any luggage?"  That question, "Do you have any luggage?"

9    is both written at -- in the affidavit and is testified to as

10   well in cross examination.

11          Further, your Honor, there is a consistent insistence

12   that Mr. Perry received permission to do these searches.  I

13   think what's -- what comes to mind is that he's protesting too

14   much, that in fact the encounter was much more in line with an

15   interrogation than a mere voluntary encounter.

16          That would also change whether or not she answered

17   the questions in a way that Mr. Perry, sorry, Officer Perry is

18   saying that she answered.  It makes more sense that she was

19   frightened and did not answer his questions.  I said, "remain

20   quiet."  Officer Perry corrected me and said she did not answer

21   the question.  When  I asked, "Well, what did that mean?"  He

22   said that she was asking actually for explanations for what was

23   going on, why.

24          It appears that Officer Perry made a connection

25   between a baggage -- bags that were at some distance and

1    Ms. Ramos-Burciaga.  I'll submit that it's not credible that

2    she had the bundle in her purse when she had a rolling suitcase

3    20 feet away.

4            THE COURT:  So where did you think it was in the --

5    the suitcase?  You think he's just lying to me about where it

6    was?

7            MR. FERNANDEZ:  I think there's certain aspects of

8    his testimony that are incredible, your Honor, and that  there

9    – that there's much more to do with the suitcase.  He testified

10   to no facts regarding the suitcase on direct examination.  On

11   cross examination that was imported.  In the affidavit, the

12   black suitcase is not even mentioned.  I could introduce that

13   as a -- for your Honor to take notice of -- it's with the

14   Court.

15           THE COURT:  Oh, I mean, I've got the affidavit.

16           MR. FERNANDEZ:  Right.  It's with the Court.

17           THE COURT:  I can see it.  Sure.

18           MR. FERNANDEZ:  So there is an apparent desire to

19   distance the testimony, distance the narrative from the black

20   suitcase which is the much more credible place to have what it

21   sounds like a very large bundle of drugs.

22           It makes sense, however, that you'd want to draw a

23   closer connection with the person and the bundle for the

24   purpose of probable cause and so you put it on the -- in the

25   thing that was attached to the person the entire time.

1          It was clear that the suitcase was searched and

2     there's clearly opportunity to find the bundle if it were in

3     the suitcase.  But it would be a much harder case for the DEA

4     to say that a bundle found in a suitcase that was otherwise

5     unattached to a person.  As  Officer Perry said, no one was

6     standing by it, no one seemed to touch it.

7          The only person that was nearby was the person who

8     ultimately got charged with the drugs.  She made no post-arrest

9     statements acknowledging the bundle, no post-arrest statements

10    saying why she would -- might have been carrying drugs.

11         The reality is there's probably surveillance that

12    will show whether or not this in fact occurred the way Officer

13    Perry described.  But at this stage there are problems with the

14    narrative that should give your Honor pause and militates

15    against finding a probable cause.  Thank you.

16         **THE COURT:**  Great.  Thank you.  I don't honestly know

17    why it would be more credible that you'd have drugs in a

18    suitcase 15 feet away from you as opposed to a backpack on your

19    back.  I've been doing this a very long time and people carry

20    drugs all different places and do it all sorts of different

21    ways.

22         Now, I agree with you, there is nothing in the

23    affidavit here concerning the rolling backpack and that is

24    certainly a point you can bring out on cross examination for

25    whatever purpose that might be.  I don't have any indication

1    it's not a voluntary encounter.

2         I have no idea whether there's surveillance that will

3    show that perhaps Agent Perry is lying.  I'm sure you've

4    discussed with your client the standard of proof for today

5    which is what's probable cause.  It doesn't mean it's more

6    likely true than false.  It's a fair probability means

7    something more than  mere suspicion but less than a

8    preponderance of the evidence.

9         And in determining probable cause, of course, I look

10   to the totality of the circumstances.  This is all out of

11   United States versus Denson, 775 F.3d 1214 and 1217; it's a

12   2014 10th Circuit case.

13        There's clearly probable cause present and so I'll

14   find probable cause to bind your client over.

15        What would you like to tell me on the issue of

16   detention?

17        **MR. FERNANDEZ:**  Your Honor, I would ask that you

18   consider releasing Ms. Ramos-Burciaga on her personal

19   recognizance or else --

20        **THE COURT:**  Without a -- without an interview, is

21   that what  you're asking me to do?

22        **MR. FERNANDEZ:**  No, your Honor.  She's open to being

23   interviewed on --

24        **THE COURT:**  Well, then why don't we get her

25   interviewed and she can come back tomorrow?  I mean, I'm not --

1  I'm not releasing her OR without an interview.  That's a pretty

2  remarkable request,  Counsel.

3     **MR. FERNANDEZ:**  Your Honor, I didn't know there was

4  no opportunity to -- she was arrested on Friday.

5     **THE COURT:**  Did you read the report?

6     **MR. FERNANDEZ:**  I read it --

7     **THE COURT:**  It says, no interview, right?

8     **MR. FERNANDEZ:**  I wasn't sure why there was no

9  interview.  I thought perhaps --

10     **THE COURT:**  You can make your client available for an

11  interview if you wish to do that.  We'll do it tomorrow.  We'll

12  have the detention hearing tomorrow morning at 9:30.  What else

13  for your client this morning?

14     **MR. FERNANDEZ:**  I mean, is it possible to return this

15  afternoon for a detention hearing or --

16     **THE COURT:**  Apparently not.  Thank you.

17     **MR. FERNANDEZ:**  Nothing further, your Honor.

18     **THE COURT:**  We're in recess.

19    **(Proceeding adjourned at 10:35 a.m.)**

20

21

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____          <u>December 17, 2017</u>

          Signed                                    Dated

*TONI HUDSON, TRANSCRIBER*