IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

Plaintiff,

v.                                          Case No. 17-CR-2236 WJ

DULCE ISABEL RAMOS-BURCIAGA,

Defendant.

**DEFENDANT'S MOTION TO SUPPRESS TANGIBLE EVIDENCE AND STATEMENTS**

Dulce Isabel Ramos-Burciaga, through counsel, Alejandro Fernandez, Assistant Federal Defender, respectfully moves this Court, pursuant to the Fourth, Fifth, and Sixth Amendments of the United States Constitution and Rule 12(b)(3)(C) of the Federal Rules of Criminal Procedure to suppress evidence discovered pursuant to an illegal search and arrest; and to suppress statements given following her arrest on August 4, 2017.

**Factual Overview**

1.      In the evening of August 4, 2017 Ms. Ramos-Burciaga exited a Greyhound bus in Albuquerque, NM.  While waiting to transfer to her connecting bus, she sat in the Greyhound waiting area.  While seated, DEA Agent Jarrell Perry approached her and began asking her questions.  Other DEA agents were nearby.

1

Eventually DEA Agent Perry searched Ms. Ramos-Burciaga's black rolling suitcase. Finding nothing, Agent Perry asked whether he could search Ms. Ramos-Burciaga's handbag. The search of the handbag uncovered the narcotics that form the basis of the charges that Ms. Ramos-Burciaga now faces. The one count indictment alleges possession with the intent to distribute one kilogram or more of heroin pursuant to 21 U.S.C. §§ 841(a)(1) and (b)(1)(A).

**Details of the Police Encounter in the Albuquerque Greyhound Station**

2. Surveillance footage of the encounter was destroyed and is the subject of ongoing litigation before this Court. Many of the details of the encounter, however, were audio recorded and additional details surfaced at a preliminary hearing that took place on August 8, 2017. (Doc. 31 Preliminary Hearing Transcript).

3. After Agent Perry walked up to Ms. Ramos-Burciaga he identified himself as a police officer and displayed his DEA badge. (Doc. 31 at 5) Agent Perry then asked if he could speak with her. Ms. Ramos-Burciaga replied "yes." Detecting limited English ability, Agent Perry asked Ms. Ramos-Burciaga "do you speak English okay?" (Audio Recording 00:28) Ms. Ramos-Burciaga responded, "yeah." Moments later, Agent Perry asked again, "you do speak English okay, right?" (Audio Recording 00:42) Ms. Ramos-Burciaga again responded "yeah."

2

Throughout the encounter, however, it is clear that Ms. Ramos-Burciaga is not a competent English speaker.  She can be heard misunderstanding questions, attempting to clarify questions posed to her, and struggling at times to express herself.

4.      After asking Ms. Ramos-Burciaga where she was traveling to, Agent Perry asked to see her ticket.  After a few more ostensibly casual questions about her residence and her travel plans, Agent Perry asked to see her identification.  In response, Ms. Ramos-Burciaga asked, "yeah, but, what happened that you stopped me?"  (Audio Recording 00:59)  Rather than assure Ms. Ramos-Burciaga that she is not stopped, Agent Perry responded, "it's just for security here at the station cause Amtrak, err, Greyhound doesn't really have any security.  So we come down here and talk with passengers for security reasons." (Audio Recording 1:02)  Ms. Ramos-Burciaga then complied and handed over her identification.

5.      Later on in the encounter, seemingly unprompted, Agent Perry explained again why he was asking Ms. Ramos-Burciaga questions.  Agent Perry remarked, "There's really not any security on the buses so basically, you can carry in whatever you want on the bus; weapons, illegal narcotics, anything illegal. Weapons, hopefully no explosives.  But you can . . . anything illegal.  You know, there is no security, so there is nobody that checks. So sometimes we got a problem

3

with people carrying, uh, things on the busses they shouldn't."  (Audio Recording 1:48)

6.     Eventually, Agent Perry asked Ms. Ramos-Burciaga to identify her luggage for him.  When she did so, Agent Perry approached the luggage.  According to Agent Perry, the luggage was 15 to 20 feet away.  (Doc. 31 at 10).  Her luggage was a black rolling suitcase.  (Doc. 31 at 9).  Once near the luggage Agent Perry asked "no weapons, anything illegal inside?"  (Audio Recording 2:48).  After Ms. Ramos-Burciaga replied "no," Agent Perry responded, "would you consent to a search of your bag for contraband ma'am?"  (Audio Recording 2:51) Ms. Ramos Burciaga responded, "yeah, sure."

7.     Agent Perry then propped the luggage on the nearby seats and proceeded to search the suitcase.  Soon, DEA Agent Pantoja "walked up and stood behind the seats where Ms. Ramos was seated."  (Doc. 31 at 13)  Agent Perry then introduced Agent Pantoja as his partner.  As Agent Perry was searching the luggage, Agent Pantoja began speaking with Ms. Ramos-Burciaga.  Agent Pantoja asked Ms. Ramos-Burciaga about her travel plans and engaged in some small talk.  Agent Perry found no contraband in Ms. Ramos-Burciaga's black rolling suitcase.

8.     Agent Perry then asked whether Ms. Ramos-Burciaga had any other luggage.  She assured him that she did not.  Ms. Ramos-Burciaga then inquired,

"everything is good?"  (Audio Recording 3:54)   Ignoring the question, Agent

Perry asked, "How about this bag over here, is this your bag on your back here?"

When Agent Perry asked that question, Ms. Ramos-Burciaga was wearing the

backpack.  (Doc. 31 at 15)

9.      When Ms. Ramos-Burciaga agreed that the bag she was wearing was

hers, Agent Perry quickly responded, "will you give me permission to search that

too?" (Audio Recording 4:02) Ms. Ramos-Burciaga responded, "why?"  Agent

Perry answered, "just to make sure you don't have anything illegal ma'am."

(Audio Recording 4:04)

10.     A back and forth ensued.  Ms. Ramos-Burciaga said "I have nothing.

What happened?  I'm nervous right now." (Audio Recording 4:07)  Agent Perry

then repeated his claim that he is just searching for security purposes.  He then

quickly rejoined with another request to search the bag on her back.  Ms. Ramos-

Burciaga responded again by asking "why?"  Agent Perry responded, "just to make

sure you don't have anything illegal inside ma'am."  (Audio Recording 4:23)

11.     Next, rather than explain to Ms. Ramos-Burciaga exactly why he

wanted to search Ms. Ramos-Burciaga's bag, Agent Perry shifted his request.  He

said, "let me ask you this, since you are not answering the question, can you just

open it up and show me the contents then, without me searching it? Is that ok with

you? (Audio Recording 4:25) Ms. Ramos-Buriciaga then opened her bag for Agent

Perry to search.

12.     At the preliminary hearing, Agent Perry testified that he did not think

Ms. Ramos-Burciaga gave him consent to search her bag.   Speaking about

whether Ms. Ramos-Burciaga gave him consent to search her bag, Agent Perry

remarked "No, she didn't answer the question for giving me permission to search it

or not.  To me, that's not answering the question.  That's either a yes-or-no

question.  All she said was, 'Why?' She asked me a question. She didn't answer

the question."  (Doc. 31 at 17)

13.     Nonetheless, Agent Perry proceeded with the search.  After being

asked to open her bag, Ms. Ramos-Burciaga complied.  Unsatisfied with simply

looking in, Agent Perry started to direct how she should manipulate the contents of

the bag.  He told her, "can you just take your stuff out of there so that I can see in

the bottom?"  (Audio Recording 4:48)  Ms. Ramos-Burciaga did as she was told.

Still unsatisfied with how Ms. Ramos-Burciaga was following his directions Agent

Perry continued, "no, but can you take this out so I can see what you have in the

bottom?  I can't see what you have in the bottom of it."  (Audio Recording 4:58)

Once Ms. Ramos-Burciaga complied with that final order, Agent Perry perceived

what he believed to be a bundle of drugs and arrested Ms. Ramos-Burciaga.

14.     There is no allegation by the government or its agents that Agent Perry or his partner had any reason to suspect Ms. Ramos-Burciaga of criminal activity.  When asked at the preliminary hearing whether the answers to any of his initial questions raised suspicion, Agent Perry said, "No, I wouldn't say so, no." (Doc. 31 at 9)  The only legal basis that the government relies upon to justify the search of Ms. Ramos-Burciaga's bag is Ms. Ramos-Burciaga's alleged consent.

15.     Confirming that there is no alternative basis to justify Agent Perry's actions, the government has argued that there is no indication that "any investigation was conducted on the Defendant" prior to the encounter, "and the events were a product of a consensual encounter as described by Special Agent Perry."  (Doc. 43 at 7)  In its response to the defense's request for discovery regarding any information Agent Perry might have had prior to approaching Ms. Ramos-Burciaga, the government forcefully objected.  The government repeated several times that "no such information exists and there is no reasonable basis for the belief in the existence of such information."  (Doc. 43 at 8)

### Custodial Interrogation

16.     Shortly after Ms. Ramos-Burciaga was arrested, she was interviewed by two DEA agent in a small interview room.  Prior to advising Ms. Ramos-Burciaga of her rights, one of the two agents, Agent Pantoja, asked her a series of

questions regarding her ability to comprehend English.  The questions soon

became investigatory.  Agent Pantoja asked, partly in English, but mostly in

Spanish, whether Ms. Ramos-Burciaga understood Agent Perry when he asked her

for permission to search her bag.  Ms. Ramos-Burciaga responded, in Spanish, that

she "more or less" understood.  (Interview Recording 1:38; 1:47, 2:17)  Agent

Pantoja, translated parts of Ms. Ramos-Burciaga's response for Agent Nutley, the

other DEA agent in the room.   Agent Pantoja's translation, however, was not

accurate.  Ms. Ramos-Burciaga said twice that she "more or less" understood

Agent Perry's request to search. (Interview Recording 1:47, 2:24) Agent Pantoja

translated her response as "yes" she understood.  (Interview Recording 2:18, 2:25)

As soon as Ms. Ramos-Burciaga was given her Miranda warnings, she invoked her

right to have an attorney present, and questioning ceased.  (Interview Recording

6:34)

### Argument

### I. Agent Perry did not have consent to search Ms. Ramos-Burciaga's bag and the government has strongly resisted any effort to find an alternative explanation to justify the search.

17.    The alleged contraband and statements in this case were obtained in

violation of Ms. Ramos-Burciaga's Fourth Amendment right to remain free from

unreasonable searches and seizures.  Statements and physical evidence obtained

following an unlawful search and seizure must be suppressed.  <u>Wong Sun v.</u>

<u>United States</u>, 371 U.S. 471 (1963); <u>United States v. Olivares-Rangel</u>, 458 F.3d

1104 (2006).

### A.    Agent Perry searched Ms. Ramos Burciaga's bag.

18.    The subject of this case is the drugs that Agent Perry found in Ms.

Ramos-Burciaga handbag just prior to arresting her.  Agent Perry claims, however,

that he "never searched the backpack until after she was arrested."  (Doc. 31 at 21)

Agent Perry echoes this idea when, during the encounter with Ms. Ramos-

Burciaga, he said, "can you just open up and show me the contents then, without

me searching it?" (Audio Recording 4:28)  Agent Perry apparently believes that he

did not search Ms. Ramos-Burciaga's bag because his hands did not touch her bag

until after she was arrested.  The argument that Agent Perry did not search Ms.

Burciaga's bag because he did not touch it is simplistic and not legally tenable.

19.    As the Supreme Court decided in <u>Katz v. United States</u>, 389 U.S. 347,

351 (1967), "the Fourth Amendment protects people, not places.  What a person

knowingly exposes to the public . . . is not a subject of Fourth Amendment

protection . . . But what he seeks to preserve as private, even in an area accessible

to the public, may be constitutionally protected."  There is no doubt that Ms.

Ramos-Burciaga sought to keep the contents of her bag private.

20.     To the extent the government claims that no search occurred because Agent Perry did not physically touch the bag, their argument must fail.  At one time in history, "[v]isual surveillance was unquestionably lawful because the eye cannot by the laws of England be guilty of a trespass."  Kyllo v. United States, 533 U.S. 27, 31-32 (2001).  The Court in Katz made clear, however, that "the reach of that Amendment cannot turn upon the presence or absence of a physical intrusion into any given enclosure."  389 U.S. at 353.  The key question is whether "the government violates a subjective expectation of privacy that society recognizes as reasonable."  Kyllo, 533 U.S. at 33.

21.     This case is much clearer than Kyllo or Katz.  In those cases the Supreme Court sought to put an edge on the murky boundaries of the Fourth Amendment in the face of emerging technologies.   Here, we are considering the physical manipulation of a closed purse.  Closed containers on our person are among the clearest examples of things over which members of society hold a reasonable expectation of privacy. "[T]he Fourth Amendment provides protection to the owner of every container that conceals its contents from plain view."  United States v. Ross, 456 U.S. 798, 822-23 (1982).  That Ms. Ramos-Burciaga moved items in her bag at the behest of Agent Perry, rather than Agent Perry doing it himself, does not change the analysis.  See, United States v. Patten, 183 F.3d 1190,

1194-95 (10th Cir. 1999) (finding that a defendant opening his own suitcase at the request of an officer constituted a search by that officer).

**B.    Ms. Ramos-Burciaga did not give valid consent to search her bag.**

22.    The government has now forcefully argued that Agent Perry's activities were justified by consent alone.  (Doc. 43)  After repeated requests from the defense, the government has insisted that there is no additional evidence to help explain why Agent Perry confronted Ms. Ramos-Burciaga.  (Doc. 43)  Thus, if Agent Perry did not engage in a purely consensual encounter, the evidence must be suppressed.

**i.    Ms. Ramos-Burciaga did not give express consent.**

23.    Ms. Ramos-Burciaga never gave verbal consent to search her bag.  As Agent Perry testified "she didn't answer the question for giving me permission to search it or not."  (Doc. 31 at 16)  Thus, this case does not rest in the legal and factual vagaries of whether "the consent, was in fact, freely and voluntarily given." Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973).  At the outset, the government is unable to carry its threshold burden of showing that any consent was given at all.

24.    The defense believes the inquiry should stop there.  Without consent, the evidence must be suppressed.  The government might argue, however, that

11

even if there are no words that convey consent, this Court must consider implicit consent. They might claim that Ms. Ramos-Burciaga's act of opening her bag conveyed consent. That argument is not reasonable on these facts.

### ii.    Ms. Ramos-Burciaga did not give implicit consent.

25.    Courts have found that implied consent can be construed from a defendant's actions, see, United States v. Jones, 701 F.3d 1300, 1320-21 (10th Cir. 2012) (collecting cases). In those instances, however, courts have asked whether the officer formed "a reasonable belief" that the defendant consented to the search. Id. at 1321. In this case, Agent Perry acknowledged that he formed no such belief. As just mentioned, Agent Perry testified that Ms. Ramos-Burciaga "didn't answer the question for giving me permission to search it or not." (Doc. 31 at 16) As further proof that he did not believe Ms. Ramos-Burciaga consented, Agent Perry claimed that what he was doing was not even a search. (Doc. 31 at 21) If Agent Perry believed he had Ms. Ramos-Burciaga's consent, it would be strange for him to later claim that he did not search her bag. ( Doc. 31 at 21)

26.    Moreover, even where consent is construed from one's actions, "valid consent must be unequivocal and specific, and freely and intelligently given." Florida v. Royer, 460 U.S. 491, 487 (1983). The government bears the burden of proof. "Mere submission to lawful authority does not equate to

consent."  United States v. Manuel, 992 F.2d 272, 275 (10th Cir. 1993).  Here,

even if Ms. Ramos-Burciaga conveyed consent, it was not voluntary.

27.    To prove that the consent was voluntary, "the government must (1)

proffer clear and positive testimony that consent was unequivocal and specific and

freely and intelligently given and (2) prove that this consent was given without

implied or express duress or coercion."  United States v. Sanchez, 89 F.3d 715, 719

(10th Cir. 1996).  Ms. Ramos-Burciaga's actions were not "unequivocal," "freely

and intelligently given," or given without "implied duress or coercion."

28.    Importantly, Agent Perry never told Ms. Ramos-Burciaga that she had

the right to refuse his probe.  Although informing a defendant of her right to refuse

consent is not a prerequisite to establishing voluntary consent, Schneckloth, 412

U.S. at 234, it is a factor that is "particularly worth noting."  Florida v. Bostick,

501 U.S. 429, 432 (1991); see United States v. Mendenhall, 446 U.S. 544, 548–49

(1980) (verbal advisement to defendant she could decline consent was "especially

significant").

29.    Further, even if consent was construed from her act of opening the

bag, Agent Perry quickly moved beyond the scope of that consent when he

directed Ms. Ramos-Burciaga to move items out of the way so that he could see to

the bottom of the bag.  See, United States v. Osage, 235 F.3d 518, 519-20 (10th

13

Cir. 2000) (finding that "[w]hen law enforcement officers rely upon consent as the basis for a warrantless search, the scope of the consent determines the permissible scope of the search").  In addition, language barriers like those present in this case "can vitiate consent" by undermining a free and intelligent waiver.  United States v. Lopez-Guzman, 145 Fed.Appx. 627, 629 (10th Cir. 2005) (citing United States v. Hernandez, 913F.2d 1506, 1510 (10th Cir. 1990)).

> ### iii.   Even if she had "consented," valid consent cannot closely follow an unlawful seizure designed to manufacture consent.

30.     Finally, even if voluntary consent could be determined from the immediate circumstances, Agent Perry's search followed an unlawful seizure. Though a lawful detention permits voluntary consent, see, Manuel, 992 F.2d at 275, courts have consistently found that valid consent cannot be given closely following an unlawful detention.  See, United States v. Fernandez, 18 F.3d 874, 883 (10th Cir. 1994) (collecting cases).

31.     Ms. Ramos-Burciaga was unlawfully detained soon after the encounter with Agent Perry began.  After less than one minute into their conversation, Ms. Ramos-Burciaga asked, "what happened that you stopped me?" (Audio Recording 00:59) Rather than explain that she was not detained, or that she

was "free to discontinue the encounter," <u>Jones</u>, 701 F.3d at 1314, Agent Perry gave his usual response; "it's just for security."

32.    As noted above, the defense acknowledges that "officers need not expressly inform suspects that they are free to go before requesting permission to conduct a search." <u>United States v. Ledesma</u>, 447 F.3d 1307, 1314 (10th Cir. 2006).  The opposite, however, is certainly not true; officers cannot confirm a suspect's belief that she is not free to go and later claim the encounter was consensual.

33.    When Ms. Ramos-Burciaga asked why she was stopped, and Agent Perry explained that it was for security reasons, she had every reason to believe that she was stopped, and her compliance was necessary.  When an officer "communicate[s] to a reasonable person that [s]he was not at liberty to ignore the police presence and go about [her] business," she has been seized for Fourth Amendment purposes.  <u>Bostick</u>, 501 U.S. at 437.  Further, the presence of multiple officers positioned to restrict her movement supports the finding of a seizure.  <u>See</u>, <u>United States v. Mendenhall</u>, 446 U.S. 544, 554 (1980) (deciding that the "threatening presence of several officers" might alone indicate a seizure).

34.    Next, to determine whether the consent was free from the taint of an illegal arrest, three factors are considered (1) the temporal proximity between the

police illegality and the consent to search, (2) the presence of intervening circumstances, and (3) the purpose and flagrancy of the official misconduct. United States v. Reeves, 524 F.3d 1161, 1170 (10th Cir. 2008). Any conceivable consent was thoroughly imbued by the taint of the unlawful seizure. Agent Perry's request to search her bags came minutes after she was seized. Then the unlawful detention was craftily exploited to mimic a consensual encounter. Finally, there was no temporal separation nor intervening circumstances between the unlawful detention and the request for consent.

## II.   Agent Pantoja subjected Ms. Ramos-Burciaga to custodial interrogation prior to advising her of her Miranda rights.

35.    Prior to subjecting a person to custodial interrogation, a person must be warned of various rights that they have. Miranda v. Arizona, 384 U.S. 436 (1966). Ms. Ramos was in custody when she gave certain statements in a DEA interview room following her formal arrest. See, United States v. Jones, 523 F.3d 1235, 1239 (10th Cir. 2008) (finding that "Miranda's custody element is triggered only in situations associated with formal arrests). She was subject to interrogation because Agent Pantoja's questions constituted "words . . . on the part of the police that [he] should have known were reasonably likely to elicit an incriminating response." Rhode Island v. Innis, 446 U.S. 291, 303 (1980). In fact, the questioning did produce an incriminating response. Thus, Ms. Ramos-Burciaga's

16

statement that she "more or less" understood Agent Perry when he requested to search her bag, and any other statements given before she was advised of her rights must be suppressed as given in violation of her Fifth and Sixth Amendment rights.

## Conclusion

36.     Agent Perry's activities are rather familiar in this jurisdiction.  He approaches unsuspecting bus and train passengers with a veneer of cordiality and attempts to engage them in a consensual encounter.  Normally, he asks for consent to talk, and then requests further consent to search the person or her personal effects.  In this manner the government calls the encounters consensual, and the searches he conducts justified by the subject's consent.  He is surprisingly successful at skirting the constitutional protections of those with whom he engages.

37.     Here, however, his normal tactics broke down.  When Agent Perry sought Ms. Ramos-Burciaga's consent to search her bag, as even Agent Perry admits, he did not receive consent.  Providing no alternative explanation to justify the search, the search was plainly unlawful.  The case in that respect is exceedingly simple.  A more technical analysis, however, reaches the same conclusion

38.     Early on, Ms. Ramos-Burciaga sought to clarify the encounter.  When she asked why she was stopped, Agent Perry told her why.  At that point, he destroyed any notion of their encounter being consensual.  Ms. Ramos-Burciaga

was thereafter seized under the Fourth Amendment.  Because the government has already forcefully contended that it was only consent that justified Agent Perry's actions, the seizure was unlawful.  On this analysis, whether Ms. Ramos-Burciaga later gave consent is beside the point; any consent would be tainted by the unlawful seizure.  Thus, the conclusion is the same.  Agent Perry's search was illegal, and any evidence subsequently discovered must be suppressed.

WHEREFORE, Ms. Ramos-Burciaga respectfully requests that this Court suppress all contraband and statements obtained as a result of her unlawful search and seizure.

Respectfully Submitted,

*[Electronically Filed]*
ALEJANDRO B. FERNANDEZ
Counsel for Ms. Ramos-Burciaga
Federal Public Defender
111 Lomas Blvd. NW, Suite 501
Albuquerque, New Mexico 87102
(505) 346-2489
Alejandro_fernandez@fd.org

18

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT on April 9, 2018, I filed the foregoing electronically through the CM/ECF system, which caused AUSA Rumaldo Armijo to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

*[Electronically Filed]*