IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

_____
                              )
UNITED STATES OF AMERICA,      )    No. 1:17-CR-02236-WJ
                              )
          Plaintiff,           )
                              )    Pete V. Domenici U.S. Courthouse
     vs.                       )    Bonito Courtroom
                              )    Albuquerque, New Mexico
DULCE ISABEL                   )    Wednesday, March 13, 2019
RAMOS-BURCIAGA,                )    3:00 P.M
                              )
          Defendant.           )
_____)


TRANSCRIPT OF PROCEEDINGS
REOPENED SUPPRESSION HEARING
BEFORE THE HONORABLE WILLIAM P. JOHNSON
CHIEF UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:   SHANA B. LONG
                     UNITED STATES ATTORNEY'S OFFICE
                     District of New Mexico
                     Post Office Box 607
                     Albuquerque, New Mexico    87103

For the Defendant:   ALEJANDRO FERNANDEZ
                     FEDERAL PUBLIC DEFENDER
                     District of New Mexico
                     111 Lomas Blvd., NW, Suite 501
                     Albuquerque, New Mexico  87102

USDC Interpreters:   MICHAEL KAGAN and MELINDA GONZALEZ-HIBNER

Reported by:         MARY K. LOUGHRAN, CRR, RPR, NM CCR #65
                     United States Court Reporter
                     Phone:  (505)348-2334
                     Email:  Mary_Loughran@nmcourt.fed.us

     Proceedings recorded by mechanical stenography; transcript
produced by computer.

I N D E X

Page

W I T N E S S

SPECIAL AGENT JARRELL WAYNE PERRY

CROSS-EXAMINATION BY MR. FERNANDEZ .................6

QUESTIONS BY THE COURT ...........................67

FURTHER CROSS-EXAMINATION BY MR. FERNANDEZ ........70

REDIRECT EXAMINATION BY MS. LONG ..................71

RECROSS-EXAMINATION BY MR. FERNANDEZ ..............74

EXHIBITS                    FORMALLY MARKED/IDENTIFIED

No.                                          Page

DEFENDANT'S A    Greyhound Passenger Lists       8

* * * * *

USA v. Ramos-Burciaga                Reopened Suppression Hearing
17-cr-2236                                       3-13-2019

1  (In Open Court at 3:05 P.M.)

2          THE COURT:  We're in session in United States vs.

3  Dulce Isabel Ramos-Burciaga, 17-CR-2236.

4          Would counsel enter their appearances, please.

5          MS. LONG:  Good afternoon, Your Honor.  Shana Long

6  for the United States.  At counsel table is Special Agent

7  Jarrell Perry with the DEA.

8          MR. FERNANDEZ:  And Your Honor, Alejandro Fernandez

9  for Ms. Ramos-Burciaga, who is present.

10          THE COURT:  All right.  I have granted, or I'm

11  allowing some limited additional cross-examination by defense

12  counsel today of Agent Perry in light of issues regarding that

13  passenger manifest.  So, how did you want to proceed?

14          MR. FERNANDEZ:  Your Honor, briefly, before we touch

15  that, I had brought up the issue of Jencks material before Your

16  Honor correctly pointed out that I'm not entitled to Jencks

17  until trial.  Rule 26.2, however, is a substantially similar

18  provision that does specifically say that at a suppression

19  hearing, the defense is entitled to any previous statements of

20  the witness.  So I just want to make sure that any previous

21  statements of Agent Perry have been turned over, any

22  contemporaneous notes that would be substantially verbatim.

23  And if there's a question, that they are submitted to the Court

24  to make sure that Your Honor is able to make any

25  determinations.  And any Grand Jury testimony that was given,

1  that that be given over.

2        I don't think that that would hinder our forward

3  movement today, because as Your Honor pointed out, there is a

4  limited scope to this hearing.  I would just ask that those

5  things be handed over so that in case there is something wildly

6  different, I can bring that to the Court's attention.  But I

7  don't think that should effect what's happening today.

8        MS. LONG:  Your Honor, having taken over this case

9  from former counsel, it just struck me as Mr. Fernandez was

10 talking that I assumed that we had provided the Grand Jury

11 testimony for Special Agent Perry prior to the suppression

12 hearing in this case, which is standard practice.  So I'll let

13 Mr. Fernandez speak to that.  But other than that, we would

14 have no additional Jencks to turn over.

15       MR. FERNANDEZ:  I don't think I got it.  Just to

16 double-check, I asked my assistant on the way here whether or

17 not she had seen it in the discovery.  She said she didn't.  My

18 assumption is that the Grand Jury testimony would be largely

19 what was already testified to at the suppression hearing, which

20 is not the area that the Court permitted us to go into for

21 today's hearing.  I would just be making sure that there's no

22 additional arguments I would have to make.

23       THE COURT:  What's the United States' standard

24 practice with respect to Grand Jury material?

25       MS. LONG:  Your Honor, we don't owe it.  As you

1   mentioned, Jencks is a trial right.  Prior to any testimony,

2   though, at a suppression hearing, we typically do produce just

3   the agent's testimony at Grand Jury, prior to that.

4          I think that for purposes of today's hearing, there

5   would have been nothing related to the passenger list and how

6   Agent Perry used that list elicited at Grand Jury, because it's

7   irrelevant to the consensual encounter.  So to the extent the

8   scope of today's hearing is solely on that issue, I don't think

9   that there's any issue with respect to Agent Perry testifying.

10         I apologize.  I did not realize Mr. Fernandez had not

11  received the Grand Jury testimony prior to this.  That's

12  something that typically we would have produced prior to the

13  suppression hearing in August.

14         THE COURT:  After today's hearing, if there is Grand

15  Jury testimony that you would normally have produced, would you

16  go ahead and send it over?

17         MS. LONG:  Yes, sir.

18         THE COURT:  And we'll see what happens.  I'm

19  beginning to think -- I'm glad your appearance is entered in

20  this case now.  Hopefully this case can move along.

21         So with that, this is a limited discussion.  Are you

22  ready to go ahead and cross-examine?

23         MR. FERNANDEZ:  Yes, Your Honor, with one thing.

24  Would you allow Ms. Ramos-Burciaga to take notes?

25         THE COURT:  Yes.  Is she left or right-handed?

1      MR. FERNANDEZ:  Right-handed.

2      THE COURT:  All right.

3      Go ahead, Agent Perry, and I'll ask the Clerk of the

4 Court to administer the oath.

5      (SPECIAL AGENT JARRELL WAYNE PERRY SWORN)

6      MR. GARCIA:  Please have a seat and state your full

7 name for the record, sir.

8      THE WITNESS:  My name is Jarrell Wayne Perry.

9      THE COURT:  Just one second.

10 (A discussion was held off the record.)

11      THE COURT:  Go ahead.

12      MR. FERNANDEZ:  Thank you.

13                   CROSS-EXAMINATION

14 BY MR. FERNANDEZ:

15 Q.   Agent Perry, you're aware that today's hearing has a

16 limited scope?

17 A.   Yes.  I did read Judge Johnson's order.

18 Q.   You're aware that today's hearing has to do with the

19 passenger lists that you obtained in this case?

20 A.   I believe that's part of it, yes, sir.

21 Q.   And also about the conversations you had with AUSA Armijo

22 regarding those passenger lists?

23 A.   Yes, sir.

24 Q.   I'm going to hand up to you what I'm going to be asked to

25 be marked as Defendant's Exhibit A for identification.  That is

USA v. Ramos-Burciaga                    Reopened Suppression Hearing
17-cr-2236                                              3-13-2019

1  a passenger list?

2  A.   Yes, sir.  That's what I refer to it as, yes, a passenger

3  list.

4              THE COURT:  Can I ask a real quick question?

5              MR. FERNANDEZ:  Yes.

6              THE COURT:  When you say passenger list, sometimes

7  I've heard terminology passenger manifest.  To your knowledge,

8  is that the same, to you?

9              THE WITNESS:  Yes, Your Honor.  Maybe to be more

10  specific, the train, the Amtrak train, has a manifest.

11              THE COURT:  All right, so I'm thinking of Amtrak.

12              THE WITNESS:  The only reason I call this a passenger

13  list is if you look down, oh, right before the names start, it

14  has the words Passenger List.  So that's just what I've always

15  referred to it as.

16              THE COURT:  So, typically is the passenger list

17  associated with Greyhound, and then the term passenger manifest

18  is associated with Amtrak, the train?

19              THE WITNESS:  Yes, sir.

20              THE COURT:  All right.  I just wanted that clarified

21  in my mind.  I'm sorry for interrupting.  Go ahead.

22              MR. FERNANDEZ:  I was going to wait to ask whether I

23  could hand up the list to Your Honor, until I had it admitted,

24  but --

25              THE COURT:  I've already got a copy right here.

```
 1            MR. FERNANDEZ:  So Your Honor has a copy?  Okay.

 2            THE COURT:  I'm assuming there's no objection to this

 3   being admitted for purposes of this hearing?

 4            MS. LONG:  No, Your Honor.

 5            THE COURT:  Okay.  Then go ahead and offer it.  Did

 6   he identify it?

 7            MR. FERNANDEZ:  He said it was a passenger list, and

 8   he said it was the list that he received in this case.

 9            THE COURT:  All right.  Then how do you want to

10   identify it, what exhibit?

11            MR. FERNANDEZ:  Defendant's A.

12            THE COURT:  All right.  Defendant's Exhibit A, the

13   passenger list, will be admitted without objection for purposes

14   of this hearing.

15        (Defendant's Exhibit No. A admitted.)

16   BY MR. FERNANDEZ:

17   Q.   The list that's before you, that's the exact list that you

18   received on August 4, 2017?

19   A.   To my knowledge, yes.

20   Q.   And when you got it, it had the markings on it as they

21   appear on that page?

22   A.   Yes, sir.

23   Q.   And it's the entire document that you received on

24   August 4, 2017?

25   A.   Yes.  It's two pages.
```

1   Q.   I wanted to discuss with you the timing of these reports.

2   On the very top left-hand corner, there's a date, August 4,

3   2017, that's listed.  Is that right?

4   A.   Yes.  You're talking about on Page 1?

5   Q.   Well, the pages aren't numbered, but I'm going to go into

6   that.  Let's say that on top of both of them, August 4, 2017,

7   on the very top left, is listed.

8   A.   Yes.  One of them has a different time.  That's why I was

9   asking.

10   Q.   That's right.  So one has 12:28 P.M., and the other has

11   12:29 P.M.?

12   A.   Yes, sir.

13   Q.   And MST, both of them?

14   A.   Yes, sir.

15   Q.   Do you understand that to be Mountain Standard Time?

16   A.   That would be my guess, yes, sir.

17   Q.   And looking at the one that says 12:29 P.M., it says,

18   "Report Origin, Glendale" at the top?

19   A.   Yes, sir.

20   Q.   12:29 P.M. is about an hour after the bus left Glendale

21   that day; is that correct?

22   A.   I don't know what time the bus left Glendale on that date.

23   Q.   At the very bottom, it says, "Glendale, Arizona, depart

24   11:25."  Do you know that to be accurate?

25   A.   I don't know what -- that was 2017.  I don't know if the

1  bus left on time or not.  But that's what time it's scheduled

2  to depart.

3  Q.   So 12:29 is about an hour after the bus is scheduled to

4  depart?

5  A.   An hour and four minutes, if my math is correct.

6  Q.   I would agree with that.  And then 12:28, the one that

7  says 12:28 on the top left --

8  A.   Yes, sir.

9  Q.   -- it says, "Report Origin, Phoenix"?

10  A.   Yes, sir.

11  Q.   And that bus was scheduled to leave at 11:00?

12  A.   Yes, sir, that's correct.

13  Q.   So that report came about an hour and 28 minutes after the

14  bus was scheduled to leave?

15  A.   Can you repeat the question again?

16  Q.   Sure.  The August 4, 2017, 12:28 P.M., or 12:28P, that's

17  the time the report was generated?

18  A.   I don't know what that top left number is.  I have no

19  idea.

20  Q.   You have no idea what that is?

21  A.   I don't know what those two numbers -- I mean, obviously

22  it's a date and a time, but I don't if it's when it was

23  generated, or -- I don't know what that is.

24  Q.   Do you have any idea, if it's not the time it was

25  generated, what it might be?

1  A.    I do not know.

2  Q.    Well, we'll say this.  The bus was scheduled to leave

3  Phoenix at 11:00.

4  A.    That's what time it was scheduled to depart, yes, sir.

5  Q.    But you don't know if it left on time?

6  A.    I do not.

7  Q.    And both these buses -- excuse me.  Let me step back.

8        Do you have any independent recollection or any way of

9  knowing when these reports were generated?

10 A.    I do not know.

11 Q.    Do you know how you got them?

12 A.    Yes, I know how I received them.

13 Q.    And how is that?

14 A.    Generally by e-mail.

15 Q.    And so there's a time stamp on the e-mail; is that right?

16 A.    I would assume so, yes, sir.

17 Q.    And you don't remember when you got that e-mail?

18 A.    No, I do not.

19 Q.    Do you still have that e-mail?

20 A.    No, I do not.

21 Q.    So it's fair to say that you got these reports before the

22 bus arrived in Albuquerque?

23 A.    Yes, I did.  When you say reports, I refer to this as the

24 same report.  It's for one bus.

25 Q.    Okay, I'll get into that.  The reason I'm saying different

1  reports is because they have different information on it.  But

2  we can call it one report.

3       At some point, you were asked by AUSA Armijo whether or

4  not you had a passenger list in this case?

5  A.   I don't know if he specifically asked me, but I told him

6  that I had a passenger list.  I don't know if he asked me that

7  exact question, but I informed him that I had a passenger list.

8  Q.   And you were asked to get a copy of the passenger manifest

9  -- passenger list?

10  A.   Not from AUSA Armijo, I was not.

11  Q.   AUSA Shana Long also spoke to you about the passenger

12  list?

13  A.   Yes, she did.

14  Q.   And that was in late 2018?

15  A.   I don't remember the date, but she spoke to me about it.

16  Q.   And she asked you to retrieve a copy of the passenger

17  list?

18  A.   She asked me if I had one, and I told her I did not, and

19  then I told her I may be able to obtain one, which I did.

20  Q.   Okay.  And you were able to get the same one that you got

21  back on August 4, 2017; right?

22  A.   Yes, sir.

23  Q.   With the markings and everything?

24  A.   Yes, sir.

25  Q.   And that's about over a year after it was sent to you?

1    A.    I don't know when I received it to be able to --

2    basically, Judge Johnson ordered us to turn it over.  I don't

3    know when I received it.

4    Q.    No, you got the list -- okay, I see what you're saying.

5    You don't know when you received it most recently?

6    A.    No, I do not remember the date.

7    Q.    You recall, though, it was about a year after you

8    originally got it?

9    A.    I don't remember.

10   Q.    Okay.  You got it after AUSA Shana Long came on the case?

11   A.    Yes.

12   Q.    When you were asked about the report by AUSA Armijo, you

13   told him that you throw these reports away; is that correct?

14   A.    I don't know if that was the exact wording.  Basically, I

15   informed him that they're not -- I don't keep them.  As a

16   general practice, I do not keep the passenger lists.

17   Q.    Did you tell him that you were able to get another?

18   A.    He didn't ask me, so, no, we didn't speak about that.

19   Q.    You didn't offer that information?  You didn't say, oh,

20   but I can get a copy?

21   A.    No, because I wasn't sure if I could get a copy.  So, no,

22   I didn't talk about that.

23   Q.    It's fair to say that this was the first case in which you

24   were asked to get a copy of a passenger list?

25   A.    That I was asked to get one?

**14**

1   Q.   That you got one.  You said you didn't know whether you

2   could get one.

3   A.   Well, it --

4   Q.   Then you learned that you could.

5   A.   It had been a while, so I was asked if I had one, and I

6   said, no, and I could try to obtain one.  I didn't know how

7   long they existed, or if they even had them.  So I didn't know

8   for sure.

9   Q.   But in this case, you learned that you could get one?

10  A.   Yes.

11  Q.   And you're saying the first time you learned that was when

12  AUSA Shana Long asked you to get one?

13  A.   That's correct.

14  Q.   So you had to get it by asking the person who sent it to

15  you originally?

16  A.   I spoke with my confidential source.

17  Q.   Is that the person who sent it to you?

18  A.   Yes.

19  Q.   Did you ask how they saved it?

20  A.   No, I didn't.  I did not.

21  Q.   Whether she or he had a file in which they filed the exact

22  reports that they sent to you?

23  A.   I didn't ask that question.  I just asked if I could -- if

24  it existed, if I could get one.

25  Q.   And just to be sure, you didn't ask your confidential

1    source whether you could get one when AUSA Armijo asked you

2    whether you still had the report?

3            MS. LONG:  Your Honor, at this point I'm going to

4    object to asked and answered.  I think we've gone over this.

5            THE COURT:  Didn't you already ask that question?

6            MR. FERNANDEZ:  I think that's true, Your Honor.

7    I'll withdraw.

8            THE COURT:  Sustained.

9    BY MR. FERNANDEZ:

10   Q.   Okay, I want to turn our focus directly to the lists,

11   themselves.  On the top of the list that says, "Report Origin,

12   Phoenix," in the left-hand corner, it says, "Schd: GLI 1342."

13   Is that right?

14   A.   Yes, sir.

15   Q.   And that stands for Schedule: Greyhound Lines 1342?

16   A.   I don't know what GLI stands for.  That's probably a

17   pretty good guess.  1342, I believe, is the schedule number.

18   Q.   That's the bus number?

19   A.   Not the bus number.  The bus number is different than the

20   schedule number.

21   Q.   Oh, I see what you're saying.  That's the number for that

22   itinerary, or like that path?

23   A.   The bus has a number printed on the side of it, and then

24   their routes or their schedules are different than the bus

25   number.

1  Q.    So that's the route number?

2  A.    I don't know if that's the exact term, but that's what I

3  would refer to it as.  I think it's referred to as a schedule

4  number.

5  Q.    Okay.  But both of these passenger lists are for the same

6  scheduled bus, 1342?

7  A.    Yes.

8  Q.    But they represent different stages of Bus 1342, or Route

9  1342; is that fair to say?

10 A.    Well, they're kind of -- part of them are duplicated.  The

11 first one is originating in Phoenix, and then after the bus

12 leaves Phoenix, it goes to Glendale, and then it picks up

13 passengers in Glendale.  The second is basically the passengers

14 that boarded in Glendale, but it also has the names of the

15 other passengers that are already on the bus.

16 Q.    So the first one -- we'll call it the first one, because

17 that one says, "Report Origin, Phoenix."

18 A.    Yes, sir.

19 Q.    And that's where the bus starts?

20 A.    No.  Actually, the bus starts in Los Angeles, but it goes

21 to Phoenix.

22 Q.    You're saying Schedule 1342 starts in Los Angeles?

23 A.    I don't know if that's the schedule number, but I know it

24 starts in Los Angeles.  I don't know if the schedule number

25 changes.  It changes in different cities.  I don't know the

1  number of the bus that leaves Los Angeles.

2  Q.   Okay.  We'll get back to that in a second.

3       The "Report Origin, Glendale," the one that says "Report

4  Origin, Glendale" at the top, that represents the first stop of

5  Bus 1342, or Schedule 1342, after Phoenix; right?

6  A.   Yes.  It goes from Phoenix to Glendale.

7  Q.   Is it okay if I refer to these reports, one as the

8  Glendale and the other as the Phoenix?  Would that make sense

9  to you, Agent Perry?

10 A.   Yes.

11 Q.   Okay.  So on the Phoenix report, there's a column named

12 "Inbound Passengers."  Do you see that?

13 A.   Yes, I do.

14 Q.   And it says -- inbound passengers are passengers switching

15 from a bus to Bus 1342; is that what you understand it to be?

16 A.   Well, as I testified earlier, the bus may be the same

17 number, the Schedule 1342.  I don't know where that schedule

18 originates.  It could be LA or it could be Phoenix.  But those

19 passengers are the passengers that are on the bus that comes

20 here to Albuquerque.

21 Q.   Okay.  On the Glendale report, there is no column that

22 says inbound passengers?

23 A.   No.  At the top, it says, "Through Passengers."

24 Q.   Right.  So Through Passengers are passengers who are

25 staying on the bus past that stop; right?

1   A.   Past what stop?  I don't understand.

2   Q.   Past the stop that's listed at the top of the report,

3   Glendale.

4   A.   I'm not exactly sure.  I don't know what the Through

5   Passengers means.  My understanding is that's passengers that

6   are coming on the bus that didn't originate in Glendale,

7   they're coming --

8   Q.   So there's no through passengers in Phoenix; is that

9   correct?

10  A.   No, it says, "Inbound Passengers."  I don't know the

11  difference between the words inbound and through.  I don't know

12  what the difference is for that.

13        MS. LONG:  Your Honor, if I may, I think that

14  Mr. Fernandez is asking Agent Perry a lot of specific questions

15  that are not necessarily relevant to how he uses this list.  So

16  he's asking Agent Perry to opine as to what through passenger

17  means or inbound passenger, and I think it's part of why Agent

18  Perry is having a hard time answering, is because he doesn't

19  generate this.  He knows how he uses this list, which is what

20  we're here for today.

21        So I would just ask that Mr. Fernandez couch his

22  questions in terms of -- you know, he may not know the answers,

23  because he's asking him to rely and interpret Greyhound

24  material.

25        MR. FERNANDEZ:  Well, Agent Perry knows how to say

1  he's not sure.  If I ask him a question, I'm not asking him to

2  make something up.  And so if I ask him a question -- for

3  instance, "What's Through Passengers?"  He said, "I don't

4  know."  So then we know that he can't use it in that way,

5  because he doesn't know what it is.

6          THE COURT:  Well, I think that's -- in other words,

7  Agent Perry, I think you've been doing this, but, for example,

8  if there are notations on this that you're not familiar with

9  because you would need somebody from Greyhound to interpret

10  this, then just indicate you don't know.  I think you've been

11  doing that.  For example, you didn't know the distinction, how

12  Greyhound distinguishes inbound from through.  So if you're not

13  sure, just answer the question that way.

14          THE WITNESS:  Yes, sir.

15  BY MR. FERNANDEZ:

16  Q.   You said the reports tell you who's getting on at a

17  particular stop; is that right?

18  A.   I don't believe I stated that.

19  Q.   You said the report help you know who is getting on and

20  who is getting off?

21  A.   I don't remember stating that, no.

22  Q.   Okay.  Do you know, based on these reports, who is getting

23  on at a particular stop?

24  A.   Specific passengers, yes.

25  Q.   And you know that because it's under the category,

1   "Originating Passengers"?

2   A.   Which list are you talking about?

3   Q.   Both of them have a column named Originating Passengers,

4   so both indicate who's getting on at that stop; is that right?

5   A.   My understanding on the Phoenix list, Originating

6   Passengers means those passengers originating in Phoenix, and

7   on the Glendale list, the Originating Passengers means those

8   passengers that are originating in Glendale.

9   Q.   So you said you weren't sure what inbound passengers were,

10  but they're not the passengers that are starting their journey

11  in Phoenix if they're listed on the Originating Passengers list

12  on the Phoenix report?

13  A.   Yes.  My understanding is they did not originate in

14  Phoenix, they were on the bus when it came into Phoenix.

15  Q.   And also on the Glendale report, Originating Passengers

16  are those passengers who got on the bus in Glendale?

17  A.   Yes, I believe I just stated that.

18  Q.   And the Through Passengers -- well, we can now do this.

19  All the Through Passengers in Glendale are those passengers who

20  got on the bus in Phoenix?  All the names listed as Through

21  Passengers in Glendale appear on the Phoenix report; is that

22  right?  And you can take your time to make sure that I'm not --

23  A.   No, I think you're partially accurate.  You said the

24  passengers that didn't originate in Phoenix.  If they're on the

25  Through Passengers in the Glendale list, yes, they were on the

1  bus when it either came into Phoenix or boarded in Phoenix.  So

2  they could have got on before Phoenix.

3  Q.   Right.  But everyone who left the station in Phoenix is on

4  the Through Passengers list in Glendale with the exception of

5  those who got off in Glendale?

6  A.   I would say that's an accurate statement.

7  Q.   And there's three people who got off in Glendale; is that

8  right?

9  A.   According to the list, yes.

10  Q.   So the Glendale list repeats all the passengers in the

11  Phoenix list, except those who got off in Glendale?

12  A.   And who got on in Glendale.

13  Q.   Right.  They added plus the eight that got on in Glendale?

14  A.   Yes, sir.

15  Q.   And by looking at the Glendale list, you can tell who --

16  sorry.  By looking at the Phoenix list, you can tell who is

17  scheduled to get off in Glendale; right?

18  A.   Yes.

19  Q.   And that, to you, indicates that they were not going to

20  arrive in Albuquerque on Bus 1342, or Route 1342?

21  A.   I think that's a correct statement, yes, sir.

22  Q.   And so this is what I mean.  You agree that there's

23  different information on the two lists?  On Phoenix and

24  Glendale, some names are listed, some names are taken off,

25  based on the movement of passengers?

1    A.    That's correct.

2    Q.    And on the bottom of the Glendale list, it has an entry

3    for Flagstaff, Arizona?

4    A.    Yes, sir.

5    Q.    And it says:  "Res on, 9."  Do you see that column and

6    entry?

7    A.    Yes, sir, I do see that.

8    Q.    Does that indicate to you that in Flagstaff, nine people

9    are going to get on the bus?

10   A.    I believe that's accurate, yes, sir.

11   Q.    And "Res off, 10," that indicates to you that ten people

12   in Flagstaff were going to get off the bus?

13   A.    Correct.

14   Q.    And then at the very end, the last thing on Glendale, it

15   says:  "Bags off, 4."

16   A.    You're talking about in Flagstaff?

17   Q.    Yes.

18   A.    Yes, I believe that's what it says, yes.

19   Q.    And you've looked at this list, and you can tell that that

20   makes sense; right?  There's nine people -- I'm sorry.  There's

21   ten people on the Glendale list that have their final

22   destination as Flagstaff; is that correct?

23   A.    I can try to count them, if you want, but I just go by the

24   bottom, and it says ten.  I believe that's going to be

25   accurate.

1  Q.    I can promise you, I'm not pulling a fast one.  There's

2  ten people.  You would agree with that?

3  A.    I have no reason to say that you can't add.

4  Q.    Okay.  And the "Bags Off, 4," you can verify that, too,

5  because there's a column that says, "Bags," and it indicates to

6  you whether or not a person getting off in Flagstaff has a bag

7  with them; right?

8  A.    Well, if you look at the passengers, and with your

9  addition, and if it says they had four bags, you add that up,

10 and if that's accurate, then you come up with that number.

11 Q.    But that's something you know about; right?  That's

12 something you look for?

13 A.    No, because I'm not in Flagstaff, so I really don't care

14 who gets off in Flagstaff.  They're off the bus before it gets

15 here, so I really don't care who gets off in Flagstaff.

16 Q.    I mean, you know who's supposed to come off a bus with

17 bags; right?

18 A.    If you -- if it's listed arriving in Albuquerque, yes,

19 it'll state how many people are getting off with bags.  But

20 this list only has two places on it, so I wouldn't know that.

21 Q.    Let's look at the Phoenix list.

22 A.    Yes, sir.

23 Q.    There's a Passenger 24, Robert Cooley.  I'm just using him

24 as an example.  Do you see that entry?

25 A.    I do, yes.

**24**

1    Q.    And it says one bag?

2    A.    Yes.

3    Q.    And "Change Bus, Albuquerque"?

4    A.    That's correct.

5    Q.    So you'd expect, if you're watching Robert Cooley get off

6    the bus, to see him take a bag off the bus; is that correct?

7    A.    Yes, but that's not always accurate.  But, yes, that bag

8    list is fairly accurate.

9    Q.    And that's at least what this schedule shows, or indicates

10   to you; right?

11   A.    Yes.  It shows he has one checked bag, and he's changing

12   buses in Albuquerque and his destination is Colorado Springs.

13   Q.    Just so I'm clear, there's a column that says, "Res

14   Number."  Is that right?

15   A.    Yes, sir.

16   Q.    And that's a person's reservation number?

17   A.    Yes, sir.

18   Q.    Is it fair to say that if someone has the same reservation

19   number, they purchased their ticket together?

20   A.    That means they're traveling together on the same

21   reservation.

22   Q.    Yes.  That's what it says?

23   A.    That's what it would mean to me, yes.

24   Q.    And we've touched on this a little bit, but the column

25   that says, "Change Bus," that's where the person would have to,

1  I guess, change their bus to get to the final destination?

2  A.   Yes.  Along the route, they would change a bus.

3  Q.   And if they change their bus, they have to take their

4  luggage off with them; right?

5  A.   In certain cities, they do.

6  Q.   And Albuquerque is one of them?

7  A.   Depends on where your destination is.

8  Q.   Denver.

9  A.   Yes.  Well, let me rephrase that.  Sometimes they do, and

10  sometimes the employees will take them off and store them for

11  them.  So it just depends.

12  Q.   I see.  But the luggage does come off the bus?

13  A.   Yes, it has to, because that bus -- they get on a

14  different bus.

15  Q.   And if someone is staying on the bus, they don't have to

16  have their luggage taken off the bus?

17         MS. LONG:  Your Honor, at this point I'm going to

18  object just in the interest of trying to get this hearing done.

19  We know what Ms. Ramos-Burciaga was doing.  My understanding of

20  the purpose of this hearing is to limit it in terms of Agent

21  Perry's use of this list in this matter.  So while it's

22  interesting to explore the intricacies of this list, as it may

23  pertain to the Defendant, I don't think that's the inquiry

24  before the Court today.

25         MR. FERNANDEZ:  Well, Your Honor, I can't confront

1   Agent Perry about the list until I know how he understands the

2   list and what information he can get from it.  I will

3   eventually get to the point to show that the way he's testified

4   he's used the list I think is inconsistent with what the list

5   actually shows, but in order to do that, I need to, I think,

6   have a pretty broad inquiry into what the list actually shows.

7            THE COURT:  Well, I guess I don't mind you inquiring

8   about the witness' knowledge of the list, but I think,

9   obviously -- for example, your client is listed, so I'm

10  assuming at some point we're going to get into some questions

11  about what he understood about her name.

12           MR. FERNANDEZ:  Yes.

13           THE COURT:  So I guess maybe the sooner we get there,

14  the better.  So if we can try to move in that direction, I

15  think it would be helpful.

16           MR. FERNANDEZ:  Okay.  Yes, Your Honor.  I'm not sure

17  if there is an objection, though.

18           THE COURT:  I guess I'll overrule the objection now,

19  but I may sua sponte raise it if we don't get to what I think

20  is the meat of the inquiry here in the not too distant future.

21  So let's leave it at that.

22  BY MR. FERNANDEZ:

23  Q.   You didn't get the list for Flagstaff; is that correct?

24  The passenger list that says, "Report Origin, Flagstaff"?

25  A.   No, I did not.

1  Q.   And you didn't get the list that says Report Origin for

2  any other city along Bus Route 1342 that day?

3  A.   Well, if you look at the Phoenix list, as you call it, the

4  list has inbound passengers.  So that list would include other

5  stops, not just Phoenix and Glendale.

6  Q.   Did you get the list for those stops?

7  A.   It's on this list.

8  Q.   I'm only asking if you got a list that says, Report

9  Origin, and then some other city other than Glendale and

10 Phoenix.

11 A.   This is all I received, these two pages.

12 Q.   And why didn't you ask for the Flagstaff list?

13 A.   That's not a list that I'm really interested in.

14 Q.   Why not?

15 A.   Because -- I'm trying to think.  I don't think I've ever

16 arrested anyone that got on the bus in Flagstaff.

17 Q.   You've never arrested someone who got on the bus in

18 Flagstaff?

19 A.   I can think for a while, but I can't recall.  If I have,

20 it's been very few.

21 Q.   Have you ever arrested someone who got on the bus in LA?

22 A.   Yes, I have.

23 Q.   And why didn't you get the LA bus list?

24 A.   It's on this list.

25 Q.   The entire LA bus list is on which list?

1  A.   On the bus that I'm checking, this specific bus, it has

2  Inbound Passengers, and if you look at the list, it has

3  handwriting.  LA, Sacramento, San Diego.  So it has paying

4  passengers that are getting on at other stops that's on this

5  list.

6  Q.   Okay.  So all the passengers from LA that you'd be

7  interested in are on the Phoenix list; is that the idea?

8  A.   I don't know what you mean by interested in.

9  Q.   You said that.  "I didn't get the other lists because I'm

10 not interested in that."

11 A.   No, I said Flagstaff.  I'm not interested in the list for

12 Flagstaff.  You asked if I'd ever arrested anyone getting on in

13 LA.  So, yes, I mentioned people getting on in LA, and that's

14 why there's writing on this list.

15 Q.   We'll get to the writing, but what I'm asking you is, why

16 didn't you want a complete list of LA?

17 A.   This is the complete list.

18 Q.   One person from LA is the complete list from LA?

19 A.   Well, there's a lot of names on there that don't have

20 writing beside them.  Some of those passengers could have

21 boarded in LA.  I don't know that.

22 Q.   So you wouldn't know that.  So I'm saying, the only person

23 you know for sure is the one person that says LA, and that's a

24 complete enough list for you?

25 A.   Yes, it is.

1  Q.   Okay.  The reason you didn't get the list has nothing to

2  do with the fact that you already found that Dulce Ramos was on

3  the Glendale list?

4  A.   Can you repeat that question, please?

5  Q.   Sure.  You didn't get the other lists because you already

6  found Dulce Ramos on the Glendale list?

7  A.   That question makes no sense to me.

8  Q.   I'll repeat it in a different way.

9       You were looking for Dulce Ramos that day; right?

10  A.   No.  This list has her name on here.  She was a person I

11  was interested in speaking with, if I could find her, which I

12  did.  So I got the list like I normally do on every other day.

13  Her name just happened to be on that list.

14  Q.   So you were interested in speaking with her before you got

15  the list?

16  A.   No.  I didn't know there was a Dulce Ramos on the bus

17  until I got the list.

18  Q.   So once you got the list, you found out that there was a

19  Dulce Ramos on the bus?

20  A.   On the list, yes, sir.

21  Q.   And then you decided you wanted to speak with her?

22  A.   She was a person I wished to speak with, yes.

23  Q.   Okay.  And why?

24  A.   Because she originated in Glendale, Arizona, she paid

25  cash, and she was destined for Denver, Colorado.

1    Q.    How did you know she paid cash?

2    A.    Because it has a CA written right beside her name.

3    Q.    There's also a gentleman -- I'm sorry.  So you were

4    interested in just the people paying cash; is that the idea?

5    A.    No.  But if you ask me to explain the list, I can explain

6    the writings and tell you what the writings mean, so maybe

7    it'll make you understand better.

8    Q.    Yes, let's do that.  First of all, can you tell us why

9    there are certain names underlined?

10   A.    Because I asked the confidential source to let me know the

11   passengers that paid cash, and also the ones -- see the RI?

12   The ones that were reissued.  That's the people that I'm

13   interested in speaking with.

14   Q.    So all the names that are underlined are either paid cash

15   or had their ticket reissued?

16   A.    Yes, sir.

17   Q.    And that's the only information that the underlining

18   signifies?

19   A.    Yes.  I think the underlining is -- I've never asked the

20   CS to underline it, but I think it probably helps them do their

21   job.

22   Q.    There's also little sort of brackets on the Phoenix list,

23   little sort of arrow points.  Do you see that?

24   A.    Yes, sir.

25   Q.    That indicates to you who is on the same reservation

1  number?

2  A.   Yes, sir.

3  Q.   Now, is there any reason why the confidential source

4  points that out to you specifically?

5  A.   Maybe to help me.  They think I can't read the numbers or

6  something.  I'm not exactly sure.  I never asked them to do

7  that.

8  Q.   It's just an aid, because you can get that same

9  information without the bracket; right?

10  A.   Yes.  I can read the numbers, yes, sir.

11  Q.   And you've already hinted at this, but in the middle of

12  the Phoenix list, there's a number of cities listed.  LA,

13  Sacramento, San Diego, Mesa.  That to you means, what?

14  A.   Are you talking about the handwriting?

15  Q.   Yes.

16  A.   Yes, that means they originated in those cities.

17  Q.   And why is that important to you?

18  A.   Because it's the ones that paid cash or are reissued.  I

19  like to know where they originated.

20  Q.   Okay.  So the only ones you don't have a city listed for

21  are the ones who are on the Originating Passengers list, so you

22  know where they originated.  Is that fair to say?

23  A.   No, I don't think so.

24  Q.   Let's see.  Adam Voltares, he's underlined in Phoenix.

25  A.   Yes, I see that.

1    Q.   But there's no city listed.  There's no city handwritten.

2    A.   All the originating passengers, to my knowledge,

3    originated in Phoenix.

4    Q.   Right.  That's all I'm saying.  So the reason they didn't

5    handwrite something in is because you know that they started,

6    they originated in Phoenix, and so you didn't need that

7    information from the confidential source?

8    A.   Correct.

9    Q.   So before you received this Glendale list, you had never

10   heard of the name Dulce Ramos?

11   A.   I had not.

12   Q.   And there was nothing about Dulce Ramos that stood out

13   other than paid in cash, coming from Glendale?

14   A.   Going to Denver, and she also had a checked bag.

15   Q.   Going to Denver.  Now, is Denver also of interest to you?

16   A.   Yes, it is.

17   Q.   Why is that?

18   A.   Because I've arrested -- I don't know the number.

19   Numerous, numerous people destined for Denver with illegal

20   narcotics.

21   Q.   How about Oklahoma City?

22   A.   I've arrested a lot of people going to Oklahoma City,

23   that's correct.

24   Q.   How about Tulsa?

25   A.   That's also correct.

1  Q.    How about Chicago?

2  A.    Not so much on the bus, but on the train.

3  Q.    Well, you'd agree that one of the connecting -- one of the

4  passengers was going to connect to a bus to Chicago; is that

5  right?  Melissa Hernandez?

6  A.    Can you tell me which list you're --

7  Q.    Glendale, midway.  It says she's going to switch in

8  St. Louis, and then her final destination is Chicago.

9  A.    I don't see that on the Glendale list.

10  Q.    Okay.  She's listed -- it's alphabetical order, and her

11  last name is Hernandez.

12  A.    Oh, okay.  I thought you were talking about the ones

13  originating in Glendale.

14  Q.    Oh, no.  She's in the through passenger list.

15  A.    I see the name.

16  Q.    And she's going to Chicago?

17  A.    It shows a destination of Chicago, yes, sir.

18  Q.    Fair to say that you've arrested people going to Chicago?

19  A.    I have --

20  Q.    How about --

21  A.    -- on the train.  I don't know about on the bus.

22  Q.    How about Nashville?

23  A.    A few.

24  Q.    Dallas?

25  A.    Very few.

1   Q.   New York?

2   A.   Yes.

3   Q.   Is it fair to say that there's actually a lot of cities on

4   this list that -- a lot of destinations that you've arrested

5   people going to?

6   A.   I've arrested a lot of people, so I believe a lot of

7   cities, yes, sir.

8   Q.   Now, you get the -- it's a common practice of yours to get

9   the passenger list?

10  A.   Yes, sir.

11  Q.   Does your source just send them to you, or do you have to

12  ask for them?

13  A.   I used to ask for them, but then they just started sending

14  them to me, because that was kind of a general practice.

15  Q.   That's every day?

16  A.   Maybe not every day, because some days I decide I'm not

17  going to work.

18  Q.   That's fair.  You should have some time off, too.

19       Did you specifically ask for them to indicate to you paid

20  in cash and what city they're come from?  Is that something

21  you've already said?

22  A.   If they paid in cash or had it reissued, I ask to look up

23  the origination city, if it's not Glendale or Phoenix, yes.

24  Q.   You testified about this at the first hearing.  I asked

25  you, what do you do with the passenger list, and you said, I

1  look at it.  Do you recall that?

2  A.   Yes.

3        MS. LONG:  Your Honor, if we could -- there's been

4  multiple hearings.  There's been a preliminary hearing --

5        MR. FERNANDEZ:  There's only been one suppression

6  hearing.

7        MS. LONG:  Right.  So I just wanted to make sure --

8  there was an evidentiary hearing, as well, on the agency where

9  Agent Perry testified, and then there was the suppression

10  hearing.  So if we can just make sure --

11        THE COURT:  Are you talking about the suppression

12  hearing?

13        MR. FERNANDEZ:  Yes.  I'll concise.

14  BY MR. FERNANDEZ:

15  Q.   In the suppression hearing at Page 40, if you have the

16  transcript, I asked you what you do with the passenger list,

17  and you said, "I look at it."  Do you recall that?

18  A.   I don't remember the exact words, but I believe that's

19  pretty accurate.

20  Q.   I asked you for some more details, and you gave us more

21  details.  Do you recall that?

22  A.   I don't remember my exact testimony.

23  Q.   Would it be helpful if I showed you a page of the

24  transcript of that hearing?  Would that help refresh your

25  recollection?

1    A.    I can read it, if you want to give it to me, yes.

2         MR. FERNANDEZ:  May I approach, Your Honor?

3         THE COURT:  You may.

4    A.    Can you tell me what number?  Do you want me to look at

5    the whole page, or just start at a certain area?

6    BY MR. FERNANDEZ:

7    Q.    Just at the top of the page to the midway down, midpoint.

8    A.    Okay, I'm finished.

9    Q.    May I retrieve it from you?

10        So when I asked you previously what you do with it, some

11   details, you said you look for certain destinations?

12   A.    Yes, sir.

13   Q.    You look for origination points?

14   A.    That's correct.

15   Q.    You look for people who have bought their tickets close

16   together, traveling from the same city to the same destination?

17   A.    Yes.

18   Q.    And you also said you look for people who are traveling

19   together?

20   A.    Yeah.  I want to know that when I get on the bus and speak

21   with people, yes.  I'd say that's an accurate statement.

22   Q.    And also whether or not they checked luggage?

23   A.    Yes, sir.

24   Q.    You didn't previously say that you looked to see whether

25   or not they paid cash; right?  If you want, I can give you your

1  testimony back.

2  A.   That's okay.  I don't think it was on that page.  I don't

3  think I testified to that earlier.

4  Q.   You also didn't say, I look at the list to see what hand

5  markings my confidential source put in there; right?

6  A.   I didn't testify to that, no.

7  Q.   You didn't say you looked to see whether or not the ticket

8  was reissued?

9  A.   I did not.

10  Q.   But you agree that those are all things that you do

11  consider?

12  A.   Yes, that is things I do consider when I look at the list.

13  Q.   Okay.  So why didn't you say, I consider whether or not

14  someone paid in cash?

15  A.   Maybe I just overlooked that on my testimony.  I've

16  testified in numerous hearings, not just in this case.  But

17  that's one of the things that's kind of a known.

18  Q.   Why didn't you put that the confidential source conveys

19  additional information above what's written on the passenger

20  list?

21  A.   Because I don't believe I was asked that question.

22  Q.   I asked you at one point -- one moment.

23      I asked you what you get from the confidential source, and

24  your answer was:  "I use a confidential source to obtain the

25  bus itinerary.  That's the only thing that I've obtained from a

1  confidential source."  Do you recall saying that?

2  A.   No.  But if you say it's in the transcript, that's what I

3  said.  I don't remember actually all my testimony.  It's been a

4  while ago.

5  Q.   So if you said, "That's the only thing that I've obtained

6  from a confidential source," you'd agree that that's not a

7  complete statement?

8  A.   That's all I -- no, I think that's a complete statement.

9  The only thing I get from a confidential source is the list.

10 You didn't ask me what was on the list.  We didn't go over what

11 was on it.  So I believe that's a complete statement.  That's

12 all that I do get.

13 Q.   Now, I want to call your attention -- one of the things

14 you thought was important, as we just went over, were people

15 that were traveling to the same city from the same city who had

16 their reservations sort of booked close together.  I know

17 that's a mouthful.  Do you want me to break it down?

18 A.   I think I understand what you're asking.  Yes, that's one

19 of the things that I look for.

20 Q.   So on the Glendale list -- excuse me.  On the Phoenix

21 list, there are two passengers, 28 and 30.  They're both

22 traveling to Oklahoma City from Phoenix, and they purchased

23 their reservations close in time.  That's why they're grouped

24 together like that; right?

25 A.   You're looking at the Phoenix list?

1   Q.   Yes, the Phoenix list.

2   A.   You're looking at No. 28 and No. 30?  That would be Ellis

3   and Vick?

4   Q.   Yes.

5   A.   They didn't originate in Phoenix, because they're not in

6   the origination passengers.  They got on before Phoenix.

7   Q.   I apologize.  You don't know where they came from; right?

8   A.   I do not.

9   Q.   So they could have come from the same city?

10  A.   Possibly, yes.

11  Q.   And just so I'm clear, the Phoenix list has the passengers

12  listed according to reservation number, and those reservation

13  numbers are in sequential order.  Do you see that?

14  A.   I'm looking at it.  I'm trying to see if they actually

15  are.  I believe that's correct.

16  Q.   So that would indicate to you that they had purchased

17  their reservation close in time to one another?

18  A.   Are you talking about 28 and 30 still, or are you talking

19  about other passengers?

20  Q.   Yes, 28 and 30 still.

21  A.   If you look at the reservation number, I don't believe

22  that they purchased their tickets close to the same time, no.

23  Q.   Okay.  So when you said you looked for people who

24  purchased their tickets close in time, what exactly are you

25  looking for?  How close does their reservation number have to

1  be?

2  A.   I don't know if I testified to the same time, because this

3  doesn't have a time.

4  Q.   You said close together.

5  A.   Close together.  That's a big difference.  I don't know

6  what time they purchased their ticket, according to this list.

7  I can look at the reservation number and look at the digits.

8  If you look at the digits on the reservation number for No. 28

9  and No. 30, those aren't close together, so I don't think those

10  two -- you said they're traveling together or close to the same

11  time.  I don't believe so.

12  Q.   You said:  "Sometimes I look for people that have bought

13  their tickets close together."  So what did you mean by that?

14  A.   By looking at the reservation number, if you look -- say

15  you looked at Mr. Ellis and Mr. Vick.  If they had all the

16  digits -- say it was 44274278, and then the other one ends in

17  79, they bought their tickets next to one another.

18  Q.   Okay.  So they have to be within one or two; is that --

19  A.   No, it's not a general practice.  I just know from my

20  experience of looking at that, the reservation numbers, that

21  they probably purchased their tickets close to the same time.

22  There's not a general one or two, it's just -- it might be

23  three, it might be four.  I don't have a general number.

24  Q.   But they're too far apart for you to consider them having

25  bought their tickets close together?

1  A.    Probably that's an accurate statement.  When you say, for

2  me, I don't know what you mean by for me.  I don't care when

3  they bought their tickets.

4  Q.    You, meaning for that factor to register.

5  A.    I'd say that's an accurate statement.

6  Q.    Now, Passengers 4 and 6, Melinda and Scott, are they also

7  too far apart for that factor to register as close in time?

8  A.    They are way far apart.

9  Q.    And also 40 and 43?

10 A.    They're pretty far apart, also.

11 Q.    Well, so how does that fall into your spectrum?  Is that

12 close enough to raise some interest, or none at all?

13 A.    Which ones are you talking about?

14 Q.    40 and 43.  And the reason I picked them out is because

15 all these pairs are traveling from the same city going to the

16 same place.

17 A.    So what was your question, again, please?

18 Q.    Is 40 and 43, who are both going to Albuquerque, do you

19 consider their reservation number close enough in time, or is

20 that far apart for that factor to be considered?

21 A.    That's not something I would generally look at, no.

22 Q.    So we've gone through a lot of things, and the AUSA

23 pointed out that maybe it's been exhaustive, but is it fair to

24 say that the only thing you used this passenger list for is to

25 find out whether someone has checked a bag, whether they paid

1   in cash or had their ticket reissued, what city they're coming

2   from, where they're going, and whether or not they are

3   traveling with someone?

4   A.   All those statements I would say are accurate, except --

5   Q.   Would you add anything?

6   A.   I wasn't finished.

7   Q.   I'm sorry.

8   A.   Except for the last one.

9   Q.   Okay.

10  A.   Sometimes when I talk to two people -- I'll give you an

11  example.  Say you and Ms. Long were traveling together, which I

12  doubt --

13  Q.   You never know.

14  A.   -- and you had tickets that were, as you say, one or two

15  digits apart, and you were going from the same city with the

16  same destination, and I get on the bus and I talk to y'all and

17  you say, no, I'm traveling by myself.  From my experience, I

18  believe you're probably traveling together, so that's something

19  that piques my interest.  So that last statement is probably

20  not accurate.

21  Q.   Okay.  Well, so that's an example of how you clarified and

22  added.  Is there anything else you'd add to the sort of list of

23  factors that you'd use this passenger list for?

24  A.   No, that's it.  Did you mention the cash part and reissue?

25  Obviously --

1  Q.    Yeah.

2  A.    -- that's why it's on there.  So that's something I'm

3  interested in.

4  Q.    And when the confidential source sends you the list, is

5  there any additional information included in that e-mail?

6  A.    No.  This is it.

7  Q.    There's no body of the e-mail, no subject line, other than

8  like, here are the lists, something like that?

9  A.    No.

10 Q.    I should clarify, what does reissue mean?

11 A.    That means that you decided you didn't want to travel on

12 your date.  I believe, unless I'm incorrect, you have a year to

13 use that ticket when you purchase it.  You have to pay $15 or

14 $20 when it's reissued.  In other words, you decided you didn't

15 want to travel that day and your ticket was reissued for a

16 later time.

17 Q.    Okay.  I'm not trying to hide something, but in the list

18 of factors, you didn't include whether or not they purchased

19 the ticket on the same day.  Is that something you consider or

20 not?

21 A.    I don't know if they purchased a ticket on the same day

22 from this list.  It doesn't have a time.

23 Q.    Do you ever know when the person purchased their ticket?

24 A.    I can estimate from the numbers, from the reservation,

25 just going from my experience, but that doesn't -- like, I can

1  give you an example, if you'd like.  If you look at

2  Mr. Engwall, No. 3 on the Phoenix list, 392, that ticket was

3  purchased weeks ago.

4  Q.   Because that's different from the other ones?

5  A.   Yes.

6  Q.   How about Passenger No. 46.  Can you tell when he

7  purchased his ticket?

8  A.   No, I can't tell you the date or time.

9  Q.   Could you tell when Ms. Ramos-Burciaga -- I'm sorry; Dulce

10  Ramos purchased her ticket?

11  A.   No, I cannot.

12  Q.   So that's not one of the factors you considered?

13  A.   Not in this, no.

14  Q.   In any case?

15  A.   Well, I can't say any case.  I might have used it -- like,

16  the last one on the list, Mr. Craig Peterson, that ticket was

17  probably one of the last tickets that was purchased because of

18  the number.  So sometimes I look at that, but not in this case,

19  no.

20  Q.   So to go back to what we were talking about before, you'd

21  expect that the passengers with their -- sorry.  You'd expect

22  that the passengers will end their journey with Greyhound at

23  their final destination; is that correct?  That's what the

24  schedule indicates?

25  A.   No, I wouldn't say that's correct.  You can get off the

1   bus any time you want, and it happens.

2   Q.   You'd expect someone whose final destination is Flagstaff,

3   or somewhere west of Albuquerque, to get off before

4   Albuquerque; right?

5   A.   Or they can get off in Flagstaff and purchase another

6   ticket to continue, which happens.

7   Q.   Okay.  Looking at the list, the people who are underlined,

8   none of those passengers, as far as the list indicates, is

9   going to get off before Albuquerque; is that correct?  Get off

10  the bus.

11  A.   I don't believe so, no.

12  Q.   That's a "yes"?  All of them are going to end up in

13  Albuquerque, according to the list?

14  A.   Unless -- according to the list, yes.

15  Q.   And that's why the confidential source underlines those

16  and not others; is that correct?

17  A.   Because I asked them to put cash and reissue.  The

18  underlining part, I believe we went over.

19  Q.   So, for instance, Originating Passenger 8 in the Glendale

20  list, Suki Upton, I don't know if that's a man or a female, but

21  if that person paid in cash, that person wouldn't be underlined

22  or indicated they paid in cash because they're not going to

23  come to Albuquerque; is that right?

24  A.   Well, their destination is --

25  Q.   Flagstaff.

1   A.    -- Flagstaff.  That's not something -- I'm not in

2   Flagstaff.

3   Q.    So they wouldn't indicate to you that he or she paid cash,

4   because they know that that person is not going to get to

5   Albuquerque?

6   A.    I would assume that's correct, yes.

7   Q.    So there are people on this list who may have paid cash,

8   who may have been reissued, but aren't marked in any way

9   because you're not ever going to get a chance to see them,

10  essentially?

11  A.    If the list is correct, yes, they're getting off before

12  here.

13  Q.    At the suppression hearing on Page 39, I asked you:  "And

14  when you approached her, at one point you asked her for her

15  name.  You knew what her name was; right?"  And you answered:

16  No, I didn't know her name.  Until I asked her for her ticket

17  and identification, I had no idea what her name was."

18       Do you recall that?

19  A.    I read it in the transcript.  I don't remember me

20  testifying that day, but I read it in the transcript.

21  Q.    Is that still true, though?

22  A.    Yes, it is.

23  Q.    You had no idea what her name was?

24  A.    I didn't know who she was.

25  Q.    And you said:  "I didn't" -- sorry.  Then I asked you:

1    "You didn't know that she was the person that you were looking

2    for?"  And you answered:  "No, I did not know that until I got

3    her ticket and her identification."

4         Is that correct?  Is that still correct today, that you

5    didn't know that you were looking for her until you got her

6    ticket and identification?

7    A.   As I testified earlier, from the list, that name was a

8    person I was wishing to speak with.  I didn't know who she was.

9    I had to basically find her, which I did.

10   Q.   And from this list, was there anyone else you were

11   interested in talking to?

12   A.   There may have been.  I don't remember, because I ended up

13   arresting your client.  So I was busy with her.

14   Q.   Well, you're the person who made the interpretation, or

15   the decision that night.  Looking at this list, is there anyone

16   you would say you would want to talk to based on what you see

17   here?

18   A.   Well, first of all --

19             MS. LONG:  Your Honor, if I may object, I think at

20   this point Mr. Fernandez is asking Agent Perry to speculate

21   about his kind of state of mind at the time.  What he's saying

22   is, he was interested in speaking with Ms. Ramos-Burciaga

23   because of information contained on the list.  He encountered

24   her and he arrested her, so he didn't encounter anyone else

25   that day.  So whether or not there was other people, and asking

1    him to go back, I just don't think that's really before the

2    Court in this hearing.

3            THE COURT:  Well, I think what I understood the

4    question -- I mean, the agent testified that he didn't speak to

5    anyone else, or certainly didn't speak to anyone after his

6    encounter with Ms. Ramos-Burciaga, because he arrested her.  So

7    he had someone in custody, essentially; correct?

8            THE WITNESS:  Yes, sir.

9            THE COURT:  But what I understood the question to

10   be -- for example, is this what you were asking?  If you looked

11   at the Glendale list, right above Ms. Ramos-Burciaga there's a

12   Jimmy Moon.

13           MR. FERNANDEZ:  I know, there's three names.

14           THE COURT:  So are you essentially asking him, if he

15   hadn't encountered your client, that if he had a chance to, he

16   would have been interested in talking to Jimmy Moon and Teresa

17   Byron?  Is that essentially what you're asking?

18           MR. FERNANDEZ:  Yes, or the other people who are

19   underlined.

20           THE COURT:  I don't have a problem with that

21   question.  In other words, for example, either the cash or the

22   re-entry people who have been identified, had you not

23   encountered this Defendant, if you had had the opportunity,

24   would you want to speak with some of the other individuals on

25   this list?

1        THE WITNESS:  Yes, Your Honor.  The list just helps

2   me identify people that I might be interested in speaking with.

3   It's not a definitive list.  We still get on the bus and talk

4   to everybody.  So, yes, I would have gotten on the bus and

5   talked with every person on this list, which we do on a daily

6   basis.

7   BY MR. FERNANDEZ:

8   Q.   You did that in this case?  You got on the bus and talked

9   to everybody?

10  A.   No, because Ms. Ramos, as I said earlier, was arrested,

11  and I don't believe I spoke with anyone else.

12  Q.   You'd agree that Ms. Ramos-Burciaga, or Dulce Ramos, was

13  one of two women who got off the bus in Albuquerque with

14  baggage?

15  A.   I can look at the whole list and see, but I don't really

16  know right now.

17  Q.   Well, I'll narrow it down for you.  There's an Erika

18  Stoner who is listed as Passenger 1 under Originating

19  Passengers in the Glendale list.

20  A.   Yes.

21  Q.   She would have gotten off the bus in Albuquerque?

22  A.   She was destined for Denver, so she would have gotten off

23  the bus to transfer onto the same bus that Ms. Ramos was

24  destined to go on.

25  Q.   And she had a bag?

1  A.    One checked piece of luggage, yes.

2  Q.    So she would have taken that bag off of the bus in

3  Albuquerque?

4  A.    That's correct, unless the employees will take it off.

5  Sometimes they'll take them off and hold them for them.  So it

6  depends who's working and how the passenger wants to handle

7  that, whether they want to take their own bag or have the

8  employees take it.

9  Q.    And then if you look on both lists, Glendale and Phoenix,

10  you'll notice no other female passenger changing buses in

11  Albuquerque.  Is that fair to say?

12  A.    If you give me a moment, I can go through all of this.

13  I'm not exactly sure.  I have to look at the whole list.

14       Also, you haven't talked about this.  You can travel under

15  a false name, which means I can buy my ticket in my name and go

16  give it to Ms. Long.  She can be a female and have a male name

17  on it, which has happened.  So you can't always go by the name,

18  if that makes sense.

19  Q.    According to the list, there's exactly two women that were

20  changing buses in Albuquerque.  Let's start there.  Is that

21  right?

22  A.    Well, I see a Charlene --

23  Q.    Dewakuku?

24  A.    Yes, if that's the correct pronunciation, that's destined

25  for Albuquerque, yes.

1   Q.   She doesn't have a bag, though; right?

2   A.   According to the list.  But you can't always go by that,

3   either.

4   Q.   It's fair to say you rely on the list to some extent,

5   though; right?

6   A.   Yes, but it's not always accurate.

7   Q.   Okay.  Is there any other female changing buses in

8   Albuquerque?

9   A.   I'm still looking.  If you could maybe direct me to it, I

10  could maybe save a lot of time.

11  Q.   I don't see any other females changing buses in

12  Albuquerque.  I see only three, and only two have bags.

13  A.   That's correct.

14  Q.   You observed Ms. Ramos take her bag off of the bus in

15  Albuquerque; is that correct?

16  A.   I did, yes.

17  Q.   And so you had a pretty strong sense of who she was once

18  you saw that?  She was either Erika Stoner or Dulce Ramos, if

19  the list is correct?

20  A.   Can you repeat your question, please?

21  Q.   According to the list, the female person who's taking her

22  bags off in Albuquerque was either Dulce Ramos or Erika Stoner?

23  A.   I can't believe that's an accurate statement.  Some

24  passengers that are continuing on their trip will get their

25  checked luggage off to get something out of it and take it with

1   them here.  So you can't always go by that.

2   Q.   When you saw it, you thought, that's a good indication

3   that that's Dulce Ramos; right?

4   A.   I didn't know until I walked up and talked to her who she

5   was.

6   Q.   But the reason you went up and talked to her is because

7   you thought it was a strong likelihood that that was the person

8   that was Dulce Ramos?

9   A.   It could have been.  I would assume that Dulce Ramos is an

10  Hispanic name.  Your client is Hispanic.  Erika Stoner I would

11  say is probably not an Hispanic person, if the name is correct.

12      So, did I know that was Dulce Ramos?  No.  Did I want to

13  find out?  Yes.  I watched her get the bag off and go inside.

14  I assumed she was either going to Albuquerque or transferring

15  north.  Once I talked to her and asked for her ticket and

16  identification, then I knew that was the person that was

17  traveling under that name.

18  Q.   Were you aware that Erika Stoner is a senior citizen?

19  A.   I have no idea.

20  Q.   You never looked at her ticket?

21  A.   I don't believe I did.

22  Q.   Do you recall seeing Erika Stoner that evening?

23  A.   I don't remember, no.

24  Q.   Do you recall someone other than Ms. Dulce Ramos, female,

25  taking their luggage off the bus?

1  A.   I don't remember.

2  Q.   You said that at times people travel under false names and

3  that sort of thing.  Do you recall seeing any Hispanic woman

4  taking luggage off the bus that night?

5  A.   I've checked hundreds of buses since then.  I don't

6  remember.

7  Q.   Do you recall speaking to AUSA Armijo on January 3, 2018?

8  A.   I've spoken to him quite often on this case.  I don't

9  remember the exact dates.

10  Q.   Do you recall a conversation in which he specifically

11  asked you about the passenger list?

12  A.   We had numerous conversations about the passenger list,

13  but did he specifically -- I told him.  Again, as I testified

14  earlier, I don't know if he ever asked me if I had one.  I told

15  him that I had the passenger list on numerous occasions.

16  Q.   And on at least one occasion, you told him that you got

17  that passenger list from a confidential source?

18  A.   Yes, I did tell him that.

19  Q.   Is that because he asked you, or because you just shared

20  that information?

21  A.   I can't remember.  I told him I had a passenger list.  He

22  may have asked me where I got it from.  I can't remember if I

23  volunteered it, or if he asked me.

24  Q.   And he told you the reason he was asking is because the

25  defense attorney had made a specific request for it?  Do you

1   recall that?

2   A.   No, I don't recall him telling me that, no.

3   Q.   He didn't reference an e-mail that the defense attorney

4   had sent?

5   A.   I believe he sent me an e-mail, but I don't believe it

6   specifically said passenger -- if it did, I don't remember, if

7   it specifically had passenger list on it or not.

8   Q.   Do you recall that the e-mail he sent to you forwarded the

9   body of the defense attorney's e-mail?

10  A.   I do recall him sending me one, but I don't remember

11  exactly what was in it.

12  Q.   And when you spoke to him about the passenger list, you

13  told him that you did get a passenger list from the

14  confidential source; is that right?

15  A.   As I testified earlier, I told him that on numerous

16  occasions.

17  Q.   And you also told him that you're not releasing it?

18  A.   I didn't tell him that I'm not releasing it, no.  I didn't

19  make that statement.

20  Q.   You didn't say, I'm not releasing it?

21  A.   No, I did not.

22  Q.   Did you say, you shouldn't release it?

23  A.   I basically told him that, from my experience in the past

24  at the U.S. Attorney's Office, that that passenger list was not

25  discoverable.

1   Q.   You told AUSA Armijo what you thought was discoverable?

2   A.   I told him the practice of the U.S. Attorney's Office in

3   previous cases was that the passenger list was not

4   discoverable, is exactly what I told him.

5   Q.   Did he seem surprised?  Did he ask you why?

6   A.   I can't recall if he asked me why or not.

7   Q.   Did he ask you to send it to him, anyway?

8   A.   I don't believe he did.

9   Q.   Did you ever send the list to AUSA Armijo?

10  A.   I don't believe I did.  I believe I sent the list to --

11  because I didn't have the list, and I don't think he asked me

12  to send it to him.  I think Ms. Long is the first person that

13  asked me to send it to her.

14  Q.   So you told him that you had a list, you said it's not

15  discoverable, and he never said, well, send it to me anyway?

16  A.   I never told him I had a list.  I told him that I had --

17  Q.   Or that you got a list.

18  A.   -- reviewed a list in this case.  I never told him that I

19  had one currently when we spoke.

20  Q.   And he never asked you to see if you could get it?

21  A.   I don't believe he did.

22  Q.   Now, on the evening -- turning to the bus, on the evening

23  you arrested Ms. Ramos-Burciaga, the bus that you were working

24  with scheduled to arrive at 9:35 P.M.?

25  A.   It changes throughout the year, a few minutes.  I believe

1  it was probably -- that's pretty accurate.  Maybe five minutes

2  later or five minutes earlier.

3  Q.   In the suppression hearing at Page 7, you testified that

4  the bus was scheduled to arrive at 9:35 P.M.  Do you have any

5  reason to change that now?

6  A.   No.  All I'm stating is that sometimes they change the

7  minutes certain times of the year, and I don't remember.  The

8  suppression hearing was a while back.

9  Q.   But if you testified to it before under oath, you'd say

10  that's a fair estimation of what you thought it was then?

11  A.   Yes, sir.

12  Q.   And you testified earlier that the bus was scheduled to

13  depart at 11:15 P.M.; is that right?

14  A.   I believe that's probably accurate.

15  Q.   And when you say the bus was scheduled to depart, that's

16  Bus 1342?

17  A.   Yes, sir, that's correct.

18  Q.   That's not the bus that Ms. Ramos-Burciaga was scheduled

19  to depart on?

20  A.   No.  She was going north, so she would be on a different

21  bus.

22  Q.   And that bus departed at 2:25 in the morning; is that

23  right?

24  A.   I'm not exactly sure.  It is early morning.

25  Q.   The list that we have in front of us tells us the time

1  that the bus was supposed to depart; right?

2  A.   It does say 2:25, yes.

3  Q.   And so according to the list, that's when the bus that

4  Ms. Ramos-Burciaga was leaving on was going to depart?

5  A.   Was scheduled to depart, yes, sir.

6  Q.   And you had no reason to think that's wrong; right?

7  A.   Not unless the bus was late.  I don't think we stayed

8  there that long.

9  Q.   So you'd agree that between 9:35 when the bus was meant to

10  come in and you testified it was supposed to arrive, and 2:25

11  in the morning, that's over four hours?

12  A.   I believe so, yes, sir.

13  Q.   So based on the schedule that you had, you expected

14  Ms. Ramos-Burciaga to be waiting in the Greyhound station for

15  over four hours?

16  A.   I expected her to be waiting to board that bus, but she

17  could have went outside, or went to a restaurant, or went

18  anywhere.  I can't say that I believed that she was going to be

19  waiting inside, no.

20  Q.   When you saw her inside the Greyhound station, as you did,

21  you understood that she wouldn't be leaving until her bus was

22  going to depart; is that right?

23  A.   I didn't know who she was until I spoke with her, and then

24  I knew that she was scheduled -- that the passenger was

25  scheduled to leave at 2:25.

1  Q.    And just based on the schedule, Dulce Ramos, the person

2  who you said you wanted to talk to, was going to have a layover

3  of over four hours?  You'd agree with that?

4  A.    Yes.

5  Q.    When you were asked about this on direct some time ago,

6  you said the first time you observed Ms. Ramos-Burciaga is when

7  she walked off the bus that had just arrived in Albuquerque.

8  A.    Yes, sir, that's correct.

9  Q.    And you watched her take baggage off the bus?

10  A.    Yes, sir, I did.

11  Q.    And you saw her walk towards the Greyhound station?

12  A.    I don't remember my exact testimony.  I haven't prepared

13  all what I did that day for this hearing because I didn't

14  believe we were going to be talking about everything that I did

15  with Ms. Ramos.  So I saw her get off the bus, and I do

16  remember her going towards the station, yes, sir.

17  Q.    And then you testified that you stood and watched other

18  passengers.  Do you recall that?

19  A.    I do not remember that.

20  Q.    Well, do you recall what you did that night after you saw

21  Ms. Ramos-Burciaga go towards the Greyhound station?

22          MS. LONG:  Your Honor, at this point I'm going to

23  object.  I'm trying to not be an obstructionist.  I believe

24  that the limited scope of this hearing is to allow defense

25  counsel to cross-examine Agent Perry as to the list and his use

1   of the list, and the representations that Agent Perry made to

2   our office about the list.  At this point, I feel like we're

3   going beyond that and getting back into issues and testimony

4   that Agent Perry already testified to at the suppression

5   hearing.

6          MR. FERNANDEZ:  Your Honor, it was represented that

7   the reason he didn't talk to anyone else was because,

8   essentially, he didn't have time, that he approached

9   Ms. Ramos-Burciaga and that he was busy arresting her and

10   that's why he didn't talk to anyone else.

11          Until I got the list, I didn't know that there were

12   at least two other people, possibly seven other people that he

13   was actually interested -- arguably as interested in talking to

14   as Ms. Dulce Ramos, and I'm trying to now, for the first time,

15   now that I know that for the first time, get at why, while he

16   was, as he testified, standing and watching other passengers,

17   why he felt he couldn't approach Jimmy Moon, Teresa Byron, Mary

18   Terry, George Brown and so on.  That's information I was never

19   privy to until I got the list.

20          MS. LONG:  Your Honor, I don't think it's relevant.

21   What we know is that he went up and he arrested

22   Ms. Ramos-Burciaga, and you have the testimony before you that

23   he was busy then bringing her to DEA and processing her.  So

24   there was no opportunity to talk to anyone else.  I don't

25   really see this line of questioning being particularly relevant

1    to the suppression issues before Your Honor.

2            MR. FERNANDEZ:  Well, certainly after she was

3    arrested, he didn't have additional time.  But what this

4    establishes is that there was at least a four-hour layover, he

5    was standing and watching other passengers --

6            THE COURT:  He wasn't there for four hours.  After he

7    arrested your client, he took her to the DEA station.

8            MR. FERNANDEZ:  Right.  So anything after he arrested

9    her, I understand.  He was busy.  But when he testified

10   originally, he said -- and this is in the suppression hearing,

11   Page 10, on direct.  Not on cross.  "What were you doing after

12   you saw Ms. Ramos-Burciaga go into the Greyhound station?  I

13   stood and watched other passengers."  That, to me, is an

14   opportunity to talk to the other passengers that he said he had

15   no chance to talk to.

16           Now, until I got this list, I wasn't privy to the

17   fact that he did, indeed, have other passengers that he wanted

18   to talk to, and so now his credibility is at issue.

19           THE COURT:  I guess I'm not following.  Had he not

20   moved to encounter your client, then obviously he was in a

21   position to talk to somebody else.  But what's the point?  He

22   didn't do that.

23           MR. FERNANDEZ:  The point is that his credibility is

24   at issue.  Whether he, in fact, had as much interest, or he

25   wanted to talk to these other people, or as I've always said,

1  he had a singular interest in Ms. Dulce Ramos for reasons that

2  fall outside the list.

3        Now we have the list and it indicates that there are

4  at least eight other people in the same position as Ms. Dulce

5  Ramos.  And although he had the time, he didn't approach them.

6  That undermines his testimony that that was, indeed, his

7  interest that night.

8        THE COURT:  Say it again.

9        MR. FERNANDEZ:  My position has always been that it's

10  not true that the only reason he approached Dulce Ramos was

11  because of the list.

12        THE COURT:  If you're talking -- what's the theory

13  you came up with?  Dual something?

14        MR. FERNANDEZ:  Parallel construction.

15        THE COURT:  I'm not interested -- you know, you can

16  take that up to the Circuit.  I'll give you a standing

17  objection.  But I'm not going there on that.  Period.  End of

18  discussion.  So, what's the relevance of this?

19        MR. FERNANDEZ:  Credibility.  Whether or not him

20  saying the reason he didn't go up to the other people is that

21  he didn't have the time.

22        THE COURT:  Well, he didn't have the time because

23  he's with your client.

24        MR. FERNANDEZ:  Only after he approached her.  I'm

25  establishing there's time before he approached her.

1      THE COURT:  How many -- the approximate time from

2  when you saw the Defendant get off the bus until you

3  approached, what would you estimate that time to be, if you can

4  recall?

5      THE WITNESS:  I can't recall.  I think I went into

6  the station once and I saw her sitting down, and then went back

7  out of the station and then went back in.  Your Honor, I'm not

8  exactly sure how long it was from the time she got off the bus

9  to when I first approached her.

10     THE COURT:  So what's the point you're making?

11     MR. FERNANDEZ:  That he wasn't actually interested in

12  speaking to other passengers, as he testified he was.  Because

13  if he was actually interested in the other passengers, he had

14  ample opportunity before he approached Ms. Ramos-Burciaga.

15     THE COURT:  Then why don't you ask the question like

16  that, and let's move on.  State that specific question.

17  BY MR. FERNANDEZ:

18  Q.  Why didn't you use the time before you approached

19  Ms. Ramos-Burciaga to talk to the other passengers that you

20  said you wanted to talk to?

21  A.  Because I was observing the passengers.  Those passengers

22  were getting back on the bus, some of them.  I don't know.  I

23  don't speak with the passengers that are getting back on the

24  bus.  I do that for a reason.  So I can only talk to one person

25  at a time.  So I wanted to watch all the other passengers get

1   off the bus and observe what they were doing, and then I talked

2   to Ms. Ramos.  So I decided to speak with her.

3   Q.   Why didn't you decide to do what you normally do?

4   A.   That is what I normally do.

5   Q.   You said you normally get on the bus and talk to all the

6   passengers.

7   A.   Yes, because the bus was going to be here until 11:15, and

8   I had an hour and however long that is to wait for the bus.  So

9   I decided to talk to Ms. Ramos waiting for those passengers to

10  get back on the bus.

11  Q.   So you didn't approach any of the other people that you

12  wanted to talk to in the time before you spoke to

13  Ms. Ramos-Burciaga because, why?

14  A.   I don't understand what you mean by, that I wanted to talk

15  to.  I wanted to talk to everybody on the bus.  This list is

16  just a list.  It doesn't mean that they have drugs.  I don't

17  know that.  There could be somebody on this list that had drugs

18  that wasn't one of the ones that was underlined.  So I don't

19  know that until I speak with them.

20  Q.   Why didn't you attempt to talk to any of the ones that

21  were underlined?

22          MS. LONG:  Your Honor, asked and answered.

23          THE COURT:  It may have been, but go ahead and answer

24  the question.

25  A.   I was interested in a passenger that ended up being

1  Ms. Ramos that was transferring buses.  These other passengers

2  that were underlined aren't transferring buses.  They're

3  getting back on the same bus.  So I wait until they get back on

4  the bus.  I didn't know who they were.

5       I wanted to see if Ms. Ramos was the passenger that was

6  going to Denver, which I did and confirmed that, and then I did

7  my encounter with her.  If Ms. Ramos hadn't had any drugs with

8  her, I would have got on the bus and talked to all the other

9  passengers like I normally do.  That's what I normally do.

10 BY MR. FERNANDEZ:

11 Q.   On January 3rd, 2018, in the conversation with AUSA

12 Armijo that we've referenced before, the topic of pre-searching

13 came up.  Do you recall that?

14          MS. LONG:  Your Honor, I'll just object before he can

15 answer.  In terms of the pre-search issue and where I

16 anticipate this going, Ms. Ramos-Burciaga had her bags with

17 her, and so there's no concern or question in this case as to

18 whether or not Agent Perry could have pre-searched the bag

19 before.  I believe that was a part of this Court's ruling in

20 reopening the suppression hearing.  This is way beyond the

21 limited purpose of the suppression hearing, and I would ask

22 that the Court direct that no questions related to that topic

23 be asked.

24          THE COURT:  I agree on that, so the objection is

25 sustained.

1          MR. FERNANDEZ:  Your Honor, may I respond to that,

2    briefly?

3          THE COURT:  You can respond, but I'm sustaining the

4    objection.  Go ahead and state whatever you want for the

5    record.

6          MR. FERNANDEZ:  The issue is that pre-search was

7    listed three times in the handwritten notes by AUSA Armijo, and

8    they were written in the same conversation regarding the

9    discovery issue that produced the issue of the passenger list.

10   Your Honor opened the hearing for three reasons:  For the

11   passenger list; the issues regarding why the passenger list

12   wasn't produced earlier; and as Your Honor repeated at least

13   twice in your ruling, the bearing those issues had on Agent

14   Perry's credibility.

15         The issue of pre-search goes to the credibility.  If

16   Agent Perry acknowledges that he pre-searches bags routinely,

17   as I would argue the notes show, that goes to his credibility

18   regarding the activities he's willing to engage in, whether

19   they're generally lawful, and whether his testimony should be

20   viewed in that light.

21         THE COURT:  Ms. Dulce Ramos-Burciaga's bags went with

22   her; correct?

23         MR. FERNANDEZ:  Right.  And in the conversation -- I

24   agree.  I'm not alleging that he pre-searched

25   Ms. Ramos-Burciaga.  His explanation to AUSA Armijo as to why

1  he did not pre-search Ms. Dulce Ramos is because he said he

2  didn't have access, he didn't have a chance, suggesting that if

3  he did have a chance, or if he did have access, he would have,

4  and that's the problem.

5           MS. LONG:  Your Honor, if I may, AUSA Armijo's notes

6  on this topic are actually not -- first of all, they're not

7  Agent Perry's statements, they are AUSA Armijo's shorthand.

8  This is the same allegation that I think Mr. Fernandez's

9  co-worker, John Robbenhaar, raised in another separate case

10 before Judge Parker, who denied this even when the question of

11 whether or not he "pre-searches" a bag came up.  And in that

12 case where it actually was an issue, even though it's not an

13 issue in this case, as was explained, Agent Perry was saying,

14 you know, they always accuse me of pre-searching a bag, and in

15 this case I wouldn't even have had an opportunity to

16 pre-search, which he does not do, because she had the bag with

17 her.

18           So it's taken out of context, it's irrelevant, and

19 it's not a part of the limited purpose of this hearing.  So we

20 don't think any questions related to that topic should be

21 allowed.

22           THE COURT:  The issue of pre-search is not relevant

23 in this case because the Defendant took the bag off the bus.

24 The objection is sustained.  Let's move on.

25           MR. FERNANDEZ:  Would it be okay for me to ask

1  whether or not he looked at other baggage on the bus that

2  evening?  Could I go into that area?

3          MS. LONG:  Your Honor, I don't think that's relevant.

4          THE COURT:  It's not relevant.  The objection is

5  sustained.  How could he if he was with your client?  He said

6  he didn't get back on the bus.

7          MR. FERNANDEZ:  He said he didn't recall what he did

8  when he left, but he said there was at least two moments.  He

9  saw her, she went in, he went in with her at some point to see

10  her, and then he left.

11          THE COURT:  We're getting way far afield.  No, let's

12  stick to what this hearing is about.

13          MR. FERNANDEZ:  It was mentioned that it was out of

14  context.  Could I ask him to give the context, if he had the

15  chance to pre-search?

16          THE COURT:  I've ruled.  Let's move on.

17          MR. FERNANDEZ:  I have no further questions, Your

18  Honor.

19          THE COURT:  Let me ask a couple, because that may

20  prompt some questions from counsel.

21          Just so I'm clear -- it's funny.  I thought the CA --

22  if I had to guess, I was going to guess California.  But CA on

23  here stands for cash?

24          THE WITNESS:  That's correct, Your Honor.

25          THE COURT:  Now, what does -- the term RI means

1  reissue.  I want to make -- I'm not sure I'm clear on that.

2        THE WITNESS:  Yes, sir.  If you purchase a ticket to,

3  say, travel today at 4:00 P.M., and you decide you're not going

4  to travel today -- you've already purchased the ticket, and

5  then you decide you want to leave tomorrow at 4:00 P.M.  You

6  can get your ticket reissued and pay like a $15 or $20 fee.  So

7  that means that the ticket -- RI means to reissue.

8        THE COURT:  All right.  But what interests you in

9  tickets that are reissued?

10        THE WITNESS:  Because sometimes people, from my

11  experience, people that I've arrested that didn't pay cash --

12  I've arrested numerous people that have had their tickets

13  reissued, and the significance of that is that sometimes people

14  that are transporting illegal narcotics, the illegal narcotics

15  aren't available when they're scheduled.

16        In other words, say I'm going to have you -- you're

17  going to transport drugs for me, and I say, go buy your ticket,

18  you're going to leave at 4:00 today.  Then at 4:00, I don't

19  have the drugs available to give you, so then I say, go buy

20  your ticket for tomorrow and I'll have the drugs for you.  So

21  that ticket's reissued.  That's significant to me because of my

22  experience of the people that I've arrested that have had their

23  ticket reissued.

24        THE COURT:  Now, in answers to some questions of

25  Mr. Fernandez about, you know, Flagstaff, you made the comment

1  you weren't interested in anybody getting on the bus in

2  Flagstaff.  Why is that?

3          THE WITNESS:  Well, sometimes -- generally Flagstaff

4  is not an origination point for illegal narcotics.  But I have

5  asked to have that list, and I believe probably my confidential

6  source just didn't send it on this date.  What happens is,

7  there's a bus that comes in from Las Vegas, Nevada, that they

8  make a connection in Flagstaff.  Sometimes I will get that

9  list, and I believe on this date I just didn't get it.

10         THE COURT:  So in terms of the lists you're

11 interested in, as far as origination, is that based on your

12 training and experience on where in your view narcotics

13 traffickers originate, or where -- I don't know if I'm using

14 the right terminology.

15         THE WITNESS:  That's correct, where they board the

16 bus in their source cities, and then how they purchase their

17 tickets.

18         THE COURT:  Now, these two lists that we were looking

19 at, one is Glen date and one is Phoenix.  Based on your

20 training and experience, are those, Glendale and Phoenix,

21 source cities?

22         THE WITNESS:  Definitely.  That's probably the most

23 people that I've arrested off the bus, have come from Phoenix

24 and Glendale.

25         THE COURT:  Now, you indicated, again, on this list,

1  regarding where Ms. Ramos-Burciaga's name appears, that there

2  was -- I believe the final destination was Denver?

3           THE WITNESS:  Yes, sir.

4           THE COURT:  Based on your training and experience,

5  what's significant about Denver?

6           THE WITNESS:  Definitely a destination city for

7  illegal narcotics, and I've arrested numerous people traveling

8  to Denver, Colorado, with illegal narcotics.

9           THE COURT:  Okay.  Any questions in light of mine?

10          MR. FERNANDEZ:  Just one.

11                    FURTHER CROSS-EXAMINATION

12  BY MR. FERNANDEZ:

13  Q.   Oklahoma City, New York, Kansas City, Washington, D.C.,

14  and Nashville are also destination cities for illegal

15  narcotics; right?

16  A.   Any city can be a destination city.  I'm going from my

17  experience and the amount of people I've arrested.  I would

18  strike Washington, D.C. and Nashville off that list.  Those

19  other ones would be people that I would -- they would be some

20  cities that I'd be interested in, yes.

21  Q.   So Kansas City and Oklahoma City would be on the list?

22  A.   Yes.  But it's just a name and it's just a list.  That

23  doesn't mean that person has drugs, it just means that it's

24  somebody that I'm interested in speaking with, other than all

25  the other normal people on the bus.  It just gives me knowledge

 1   of the people that are on the bus.  That's all it does.

 2           MR. FERNANDEZ:  No further questions.

 3           THE COURT:  Ms. Long, do you have any questions?

 4           MS. LONG:  Very briefly, Your Honor.  Thank you.

 5                   REDIRECT EXAMINATION

 6   BY MS. LONG:

 7   Q.   Briefly, Agent Perry, on cross-examination you were asked

 8   a series of questions related to your testimony at the

 9   suppression hearing where you had testified that the only thing

10   that you obtained from a confidential source was the bus

11   itinerary or list.  Do you remember that?

12   A.   Yes, sir -- I mean, yes, ma'am.  I'm sorry.

13   Q.   That's okay.  I can be very strong-willed.

14       And so do you also recall the questions where you were

15   asked why you didn't think to clarify that there was

16   handwriting on those lists; is that correct?  Do you recall

17   those?

18   A.   Yes, I do remember that question.

19   Q.   Now, in terms of that testimony, I want to put it a little

20   bit in context.  Do you recall that at the suppression hearing,

21   Mr. Fernandez had asked you about this concept of parallel

22   construction?

23           MR. FERNANDEZ:  Your Honor, objection.  If I can't go

24   into it --

25           THE COURT:  Well, yes, I just told him he couldn't go

1   into it, so why are you going into it?

2          MS. LONG:  Your Honor, I just want to clarify that

3   Agent Perry's answer that he only received the list was in the

4   context of, he didn't receive information from anyone else.  I

5   feel like for purposes of redirect, if this was a normal

6   hearing, I'm trying to allow Agent Perry to further explain

7   that his answer of, I only got the list, was in the context of,

8   I didn't have other information from other sources, not that --

9   I believe Agent Perry testified that in his mind, the list is

10  the list and the handwriting, so perhaps it's unnecessary.

11  That's all I'm trying to elicit.

12         THE COURT:  Well, I know, but then Mr. Fernandez is

13  going to get up on recross and go into this parallel

14  construction.  So I'm going to sustain Mr. Fernandez's

15  objection.

16         MS. LONG:  That's fair enough.

17  BY MS. LONG:

18  Q.   Just so we're clear, though, when you testified that the

19  only thing you got was the list, what does the list mean to

20  you, when you testified to that?

21  A.   These two documents that I'm holding in my hand that we've

22  been discussing since we've been here.

23  Q.   Okay.  And does that include the handwriting, as well?

24  A.   Yes, of course.

25  Q.   Now, in terms of the cities that are marked, and I believe

1    the Court asked the questions that I was going to ask, but I

2    just want to make sure we're clear, why are the certain cities

3    that are handwritten on here, in terms of origination cities,

4    why are those cities the ones that the CS included?

5    A.   Because those are the ones that paid cash or had their

6    tickets reissued.  I want to know what cities they originate

7    in, and that list doesn't show what cities they originated in.

8    Q.   Okay.  Now, going back to just generally your use of this

9    list, have you approached and talked to people that have been

10   flagged on the list, say because they paid cash or because of

11   tickets that were reissued, where you did not encounter

12   narcotics?

13   A.   Yes, on numerous occasions.

14   Q.   And have you spoken with passengers in the context of

15   speaking with all passengers on the bus that were not flagged

16   on this list that did, in fact, have narcotics?

17   A.   Yes.  Also, on numerous occasions.

18   Q.   So is there anything about this list that leads you to

19   conclude, just looking at the list, this person definitely has

20   or does not have narcotics?

21   A.   No, none whatsoever.

22   Q.   In terms of -- you were asked questions about the

23   passenger list and your conversations with AUSA Armijo.  Do you

24   recall those questions?

25   A.   Yes, ma'am.

1  Q.   Did you have an opportunity to review the documents that

2  Greyhound had provided the Court prior to your testimony at the

3  suppression hearing?

4  A.   If you're talking about the --

5          THE COURT:  Are you referencing what Greyhound

6  responded to on the Rule 17(c) Subpoena?

7          MS. LONG:  That's correct.

8  A.   That was going to be my question.  Yes, I reviewed those.

9  BY MS. LONG:

10 Q.   So after --

11 A.   Yes.

12 Q.   -- after the suppression hearing?  But when you went into

13 the suppression hearing, were you made aware by AUSA Armijo

14 that Greyhound had provided documents to the Court?

15 A.   No, I don't believe so.

16          MS. LONG:  No further questions.  Thank you.

17          THE COURT:  Is there any recross?

18          MR. FERNANDEZ:  Yes, Your Honor.

19                    RECROSS-EXAMINATION

20 BY MR. FERNANDEZ:

21 Q.   You said you've arrested a number of people who were not

22 flagged on the passenger lists?

23 A.   Ms. Long said flagged.  That's not like marked as cash or

24 reissued.  That's what I believe she meant by flagged.  So,

25 yes, I've arrested numerous people on the bus that's not, as

1    you termed, flagged.

2    Q.   And in those cases, why did you encounter them or talk to

3    them?

4    A.   Because they were sitting on the bus.  As I testified

5    earlier, this is a list.  I still get on the bus and talk to

6    everyone, unless we arrest someone and I can't do that.

7    Q.   I'm sorry; what can't you do?  I actually didn't follow.

8              THE COURT:  What he's saying is, he tries to talk to

9    someone, but if he ends up having to arrest them, then he can't

10   talk to the other people.

11             MR. FERNANDEZ:  Oh, I see.

12   BY MR. FERNANDEZ:

13   Q.   Is that what you --

14   A.   Yes.  Basically, yes, sir.

15   Q.   Now, you were asked just now whether or not you were told

16   about the documents in response to the 17(c) Subpoena before

17   you testified last time, and you said you didn't, you weren't.

18   A.   I saw them at some time.  I don't know if it was at the

19   hearing or when it was.  I can't remember exactly when I've

20   seen those documents.  But I don't believe it was before the

21   hearing.

22   Q.   You had no reason to believe that AUSA Armijo had the list

23   that you said you no longer had; right?

24   A.   I don't really understand your question.  You're talking

25   about this list?

1   Q.    Yes.

2   A.    I don't know if AUSA Armijo had that list.  I don't know

3   how he would have obtained it, so I don't believe he had that

4   list, no.

5              MR. FERNANDEZ:  Okay.  No further questions.

6              THE COURT:  All right.  You may step down.

7              THE WITNESS:  Thank you.

8              MS. LONG:  Your Honor, just while we're here today, I

9   tracked down that we did have the Grand Jury testimony

10  transcribed.  I don't know if it was produced.  I accept

11  Mr. Fernandez's representation.  If he doesn't have it, he

12  doesn't have it.  I reviewed it on my phone, and I didn't see

13  anything that came within what we're here for today, in terms

14  of what we've discussed, and I will provide a copy of that to

15  Mr. Fernandez.

16             THE COURT:  Okay.  What's the next -- I'm sure that

17  counsel attribute different significance to the testimony, but

18  what do you want to do?  Do you want to follow-up with some

19  kind of a written closing, in terms of where we go from here?

20             MR. FERNANDEZ:  I'm happy to submit whatever

21  additional argument on this hearing, Your Honor, in writing.

22             THE COURT:  In other words, I was going to say,

23  submit whatever you believe is significant in terms of what I

24  should or shouldn't do, and then -- but I would wait and do it

25  after you've had a chance to look at that Grand Jury testimony

1   she's going to provide.  And then if there's something

2   significant in there, I guess flag it, and then Ms. Long, you

3   can respond, and then I'll give Mr. Fernandez the last word on

4   it.  Is that acceptable?

5           MS. LONG:  Yes, Your Honor.

6           THE COURT:  How much time -- you're going to get that

7   testimony to him pretty soon; right?

8           MS. LONG:  Yes, Your Honor.

9           THE COURT:  Then how much time do you want?  Are you

10   all going to want this transcribed?

11          MR. FERNANDEZ:  Yes.

12          THE COURT:  So from the time you receive the

13   transcript, how long do you want?

14          MR. FERNANDEZ:  I think I could do that, review that

15   in a week.  And then in order to get the transcript of today's

16   hearing and submit arguments would be maybe an additional two

17   weeks -- excuse me.  Two weeks after I receive the transcript.

18          THE COURT:  So you want two weeks from after you

19   receive the transcript.  Can you then respond in a week?

20          MS. LONG:  Yes, Your Honor.

21          THE COURT:  And then I'll give you a week to reply.

22          MR. FERNANDEZ:  That works.

23          THE COURT:  And then I'll issue an order.  Is that

24   acceptable to everyone?

25          MS. LONG:  Yes, Your Honor.

1          THE COURT:  Okay.  Is there anything else, then,

2   today we need to take up?

3          MS. LONG:  Your Honor, briefly, we're set for a trial

4   in this matter on April 1st.  I know in speaking with your

5   Courtroom Deputy that because of ongoing litigation, you

6   haven't required Motions to Continue, but I just wanted to make

7   sure that we're on the same page in terms of that trial

8   setting.

9          MR. FERNANDEZ:  It's my understanding, Your Honor,

10  that any pending litigation initiated by myself would waive

11  speedy trial.

12         THE COURT:  It does, so it would make sense, it seems

13  to me, to vacate the April 1st setting.  It was on a trailing

14  docket.  There's no objection to that?

15         MR. FERNANDEZ:  No objection.

16         MS. LONG:  No objection, Your Honor.

17         THE COURT:  I think, then, what I need to do is as

18  soon as we have the written submissions on this case, based on

19  what I rule, then we'll set a pretrial conference and figure

20  out where we go from there.

21         MS. LONG:  Yes, Your Honor.

22         THE COURT:  All right.  We'll be in recess.  Thank

23  you.

24  (Proceedings adjourned at 4:45 P.M.)

25                      *  *  *  *  *

USA v. Ramos-Burciaga                 Reopened Suppression Hearing
17-cr-2236                                            3-13-2019

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF NEW MEXICO

 3   _____
                                    )
 4   UNITED STATES OF AMERICA,      )
                                    )
 5            Plaintiff,            )
                                    )
 6       vs.                        )   No. 1:17-CR-02236-WJ
                                    )
 7   DULCE ISABEL                   )   REOPENED SUPPRESSION HEARING
     RAMOS-BURCIAGA,                )
 8                                  )
              Defendant.            )
 9   _____)

10

11            CERTIFICATE OF OFFICIAL COURT REPORTER

12       I, Mary K. Loughran, CRR, RPR, New Mexico CCR #65, Federal

13   Realtime official Court Reporter, in and for the United States

14   District Court for the District of New Mexico, do hereby

15   certify that pursuant to Section 753, Title 28, United States

16   Code, that the foregoing is a true and correct transcript of

17   the stenographically reported proceedings held in the

18   above-entitled matter on Wednesday, March 13, 2019, and that

19   the transcript page format is in conformance with the

20   regulations of the Judicial Conference of the United States.

21   Dated this 28th day of March, 2019.

22   _____
     MARY K. LOUGHRAN, CRR, RPR, NM CCR #65
23   FEDERAL OFFICIAL COURT REPORTER
     333 Lomas Boulevard, Northwest
24   Albuquerque, New Mexico  87102
     Phone:  (505)348-2334
25   Email:  Mary_Loughran@nmcourt.fed.us
```