**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 18, 2020**

# UNITED STATES COURT OF APPEALS
# TENTH CIRCUIT

**Christopher M. Wolpert**
**Clerk of Court**

---

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

DULCE ISABEL RAMOS-BURCIAGA,

    Defendant - Appellant.

No. 19-2174
(D.C. No. 1:17-CR-02236-WJ-1)
(D. N.M.)

---

## ORDER AND JUDGMENT[*]

---

Before **TYMKOVICH**, Chief Judge, **BRISCOE**, and **MURPHY**, Circuit Judges.

---

## I. Introduction

    Appellant, Dulce Isabel Ramos-Burciaga, appeals the denial of her motion to suppress illegal drugs found in her possession. Ramos-Burciaga argues she was seized at a Greyhound bus station by agents from the Drug Enforcement Administration ("DEA") and this illegal detention tainted any subsequent consent she gave to the search of her backpack. Even assuming she was not seized,

---

[*]This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Ramos-Burciaga argues her consent to search was coerced and the district court clearly erred when it found otherwise.

Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we hold that Ramos-Burciaga was not seized and the search of her backpack does not bear any indicia of unlawful coercion. Accordingly, we **affirm** the denial of her motion to suppress.

## II. Background

Ramos-Burciaga was traveling by Greyhound bus from Arizona to Colorado. She exited the bus when it stopped in Albuquerque, retrieved her luggage, and entered the terminal. As she sat inside the terminal waiting for her bus to Denver, she was approached by DEA Special Agent Jarrell Perry. Agent Perry had been given information by a confidential informant that a Greyhound customer named Dulce Ramos had begun her journey in Glendale, Arizona; was destined for Denver, Colorado; had paid cash for her ticket; and had checked one piece of luggage. He testified that, based on this information, Dulce Ramos "was a person [he] wished to speak with." Agent Perry also testified, however, that when he approached Ramos-Burciaga at the bus station, he did not know she was the woman identified by the informant as Dulce Ramos.

Agent Perry identified himself as a police officer and showed Ramos-Burciaga his DEA badge. The government submitted a transcript of the exchange

between Agent Perry and Ramos-Burciaga, the relevant excerpts of which are set out below:

    Agent Perry:  Hello, ma'am, how ya doin' today?

    Ramos-Burciaga:  Ah…

    Agent Perry:  I'm a police officer . . .

    Ramos-Burciaga:  Ah-hah.

    Agent Perry:  . . . and we check the station here for security.  May I speak to you for a moment?

    Ramos-Burciaga:  Uh, yeah.

    Agent Perry:  Do you speak English okay?

    Ramos-Burciaga:  Yeah.

    Agent Perry:  Okay.  May I speak to you for a moment?

    Ramos-Burciaga:  Yeah, sure.

    . . . .

    Agent Perry:  Okay.  Here's your ticket back.  Do you have ID with you Miss uh, Ramos?

    Ramos-Burciaga:  Yeah, but what happen (UI)?

    Agent Perry:  It's just for security here at the 1 station cuz Amtrak, ur, Greyhound doesn't really have any security so we come down here and speak with passengers for security reasons.

    Ramos-Burciaga:  Okay.

    . . . .

Agent Perry. Yeah, we just check the station here. It's just for security, speaking to all the passengers.

Ramos-Burciaga: All right.

Agent Perry: Yeah.

Ramos-Burciaga: It's like, vi, vi, violence here or something?

Agent Perry: Well, no, it's just that Greyhound uh . . . really doesn't have any security when you board. Did you board in Phoenix?

Ramos-Burciaga: Yeah.

Agent Perry: Okay. Uh, there's not really any security on the busses so basically you can carry whatever you want on the bus. Weapons, illegal narcotics, anything illegal. Weapons, hopefully no explosives but you can . . . anything illegal.

Ramos-Burciaga: Mh-hm.

Agent Perry: You know, there's no security, so there's no, no checks. So sometimes we got a problem with people carryin' uh . . .

Ramos-Burciaga: Oh, no.

Agent Perry: . . . things on the busses . . .

Ramos-Burciaga: I never do . . .

. . . .

Agent Perry: Okay. Would you consent for a search of your bag for contraband, ma'am?

Ramos-Burciaga: Yeah, sure.

. . . .

Agent Perry:  Yeah. Do you have any other luggage with you other than this bag?

Ramos-Burciaga:  No, that's it.

. . . .

Agent Perry: Yeah.  How 'bout this bag over here?  Is this your bag on your back here?

Ramos-Burciaga:  Yeah, that's uh, the (unintelligible) I have.

Agent Perry:  Okay.  Will you give me permission to search that too?

Ramos-Burciaga:  Why?

Agent Perry:  Just to make sure you don't have anything illegal, ma'am.

Ramos-Burciaga:  I don't, nothing (chuckles).

Agent Perry:  Okay.

Ramos-Burciaga:  What happen?  I'm . . . nervous right now.

Agent Perry:  Oh, there's no reason to be nervous.  As I explained to you over there, it's just for security at the bus station.  Is that a purse or a backpack?

Ramos-Burciaga:  My purse.

Agent Perry:  Okay.  Okay.  Would you give me permission to search it or no?

Ramos-Burciaga:  But why?

Agent Perry:  Just to make sure you don't have anything illegal inside, ma'am.  Let me ask you this, since you're not answering the question, can you just open up, show me the contents then . . . without me searchin' it?  That okay with you?

Ramos-Burciaga: Yeah, of course.

Agent Perry: Okay.

. . . .

Agent Perry: Can you just take your stuff outta there so I can see in the bottom?

Ramos-Burciaga: Yeah, sure.

. . . .

Agent Perry: . . . [C]an you take this out so I can see what you have in the bottom? I can't see what you have in the bottom of it.

Ramos-Burciaga: Yes.

After Ramos-Burciaga shifted the contents of her backpack, Agent Perry was able to see an oblong-shaped bundle wrapped in black electrical tape. He testified that he knew from experience it was a bundle of illegal narcotics. Ramos-Burciaga was immediately arrested. She was subsequently charged with one count of possession with the intent to distribute one kilogram or more of heroin, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A). Ramos-Burciaga moved to suppress the heroin, arguing it was discovered during an unconstitutional search after she was illegally seized.[1] The district court denied the motion to suppress the drugs, finding the encounter between Ramos-Burciaga

---

[1] Ramos-Burciaga also moved to suppress statements she made during a custodial interrogation. The district court ruled in favor of Ramos-Burciaga and the statements were suppressed.

and Agent Perry was consensual and further finding that Ramos-Burciaga voluntarily consented to the search of her backpack. After her motion was denied, Ramos-Burciaga entered a conditional guilty plea, reserving the right to appeal the district court's denial of her motion to suppress.

### III. Discussion

*A. Seizure*

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures." U.S. Const. amend. IV. When this court reviews "the denial of a motion to suppress, we accept the district court's factual findings and determinations of witness credibility unless they are clearly erroneous." *United States v. Moran*, 503 F.3d 1135, 1139 (10th Cir. 2007) (quotation omitted). "[T]he ultimate issue of whether a seizure occurred is a question of law, which we review de novo." *United States v. Guerrero*, 472 F.3d 784, 786 (10th Cir. 2007).

There are three types of police-citizen encounters: (1) consensual encounters, which do not implicate the Fourth Amendment; (2) investigative detentions, which must be justified by reasonable suspicion of criminal activity; and (3) arrests, which must be justified by probable cause. *See United States v. Roberson*, 864 F.3d 1118, 1121 (10th Cir. 2017). According to Ramos-Burciaga, her encounter with Agent Perry at the Greyhound bus terminal was an

investigative detention not justified by reasonable suspicion. The district court determined the encounter was consensual.

With respect to consensual encounters, it is well-established that "officers do not violate the Fourth Amendment's prohibition on unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen . . . provided they do not induce cooperation by coercive means." *United States v. Drayton*, 536 U.S. 194, 200–01 (2002) (citations omitted). When evaluating "whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 439 (1991). "So long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual and no reasonable suspicion is required." *Id.* at 434 (citation omitted). The reasonable person inquiry "focuses on the objective viewpoint of one in the defendant's circumstances." *United States v. Carbajal–Iriarte*, 586 F.3d 795, 801 (10th Cir. 2009). The following facts are relevant to a determination of whether an encounter is consensual:

> (1) the threatening presence of several officers; (2) the brandishing of a weapon by an officer; (3) physical touching by an officer;

>(4) aggressive language or tone of voice by an officer indicating compliance is compulsory; (5) prolonged retention of an individual's personal effects; (6) a request to accompany an officer to the police station; (7) interaction in a small, enclosed, or non-public place; and (8) absence of other members of the public.

*United States v. Rogers*, 556 F.3d 1130, 1137–38 (10th Cir. 2009). This list of facts "is not exhaustive, nor is any one factor dispositive." *Id*. at 1138. "We review de novo the relevant circumstances to determine whether an interaction between an individual and a law enforcement officer is a consensual encounter that does not implicate the Fourth Amendment." *Id*. at 1137 (quotation and citation omitted).

Ramos-Burciaga challenges several aspects of the district court's ruling. According to her, the court's errors included finding that: (1) the agents did not stand in threatening positions, (2) Agent Perry did not use assertive language or gestures, (3) Agent Perry did not deceive her by representing he was conducting a security check, and (4) she was not targeted for questioning. The record, however, contains sufficient evidence to support all these findings.

There is no dispute that at least two DEA agents were involved in the encounter. While Agent Perry was searching Ramos-Burciaga's suitcase, Agent Larry Pantoja approached the pair and stood behind Ramos-Burciaga who was

seated.² Although Ramos-Burciaga claims she was unable to leave the area because Agent Perry stood directly in front of her and Agent Pantoja directly behind her, Agent Perry testified that neither he nor Agent Pantoja obstructed Ramos-Burciaga's "ingress or egress" and did not physically touch her. Thus, the district court's finding that "neither agent blocked [Ramos-Burciaga's] ability to leave, and they were not in threatening positions" is supported by Agent Perry's testimony.

Likewise, there is support for the district court's finding that Agent Perry did not use assertive language or gestures. Ramos-Burciaga replicated Agent Perry's gestures when she testified at the suppression hearing, and the district court observed the gestures.³ Thus, the court's finding that Agent Perry's hand gestures were not threatening to a reasonable person in Ramos-Burciaga's position was based on its observations of Ramos-Burciaga's hand movements during her testimony. The district court was not required to accept her subjective interpretation of Agent Perry's presence as "imposing." Further, the district

---

² Ramos-Burciaga has not identified a single case standing for the proposition that the mere presence of more than one officer is sufficient, standing alone, to establish a "threatening presence." Instead, in an analogous context, this court concluded a similar police-citizen encounter was non-coercive. *See United States v. Benard*, 680 F.3d 1206, 1211 (10th Cir. 2012).

³ Ramos-Burciaga testified Agent Perry "was gesturing with his hands, like he was expecting me to give [my identification] to him." While giving this testimony, the record shows that Ramos-Burciaga mimicked Agent Perry by putting her "open palm out in front of her."

-10-

court noted it weighed the testimony of Ramos-Burciaga and Agent Perry and listened to the audio recording of the encounter before finding that Agent Perry "did not use any threatening gestures or intimidating body language." The court specifically found that, based on the audio, Agent Perry's demeanor was "calm and respectful," undermining Ramos-Burciaga's description of his overall conduct as intimidating and coercive.

Ramos-Burciaga also challenges the district court's finding that Agent Perry did not act deceptively by telling her he was conducting a security check. Based on the transcript of the encounter, the district court found Agent Perry truthfully told Ramos-Burciaga he speaks with passengers at the bus terminal to determine if they are boarding busses with "anything illegal," including weapons and narcotics. Ramos-Burciaga, nonetheless, argues Agent Perry was not checking passengers randomly, as he told her. Rather, he specifically targeted her for an investigative detention based on information he received from a confidential informant. Again, the district court's finding to the contrary that Ramos-Burciaga was not "targeted" is supported by Agent Perry's testimony that he did not know Ramos-Burciaga's name when he approached her but learned it only when she presented her identification. Ramos-Burciaga's argument that the agents had a "particularized focus" on her and she was "the sole focus of two agents' attention in a crowded bus station," is not persuasive. First, as the

district court found, Agent Perry did not focus his attention on her because he did not know who she was. Second, based on the record in this matter, the fact Agent Perry and Agent Pantoja spoke only to Ramos-Burciaga, instead of multiple passengers, would not lead a reasonable person in her position to believe the agents suspected her of committing a crime. Ramos-Burciaga does not explain how, or if, she knew she was the only passenger Agent Perry had approached in the terminal. Thus, we are not persuaded the district court clearly erred in finding Agent Perry was not deceptive and did not give Ramos-Burciaga the impression he suspected she was carrying illegal drugs.

Ramos-Burciaga also asserts Agent Perry led her to believe she was required to speak to him, in the same way she would be required to submit to a security check conducted by an agent with the Transportation Security Administration ("TSA"). She argues her belief is supported by a question she posed to Agent Perry, asking why she had been stopped. The record, however, confirms that Agent Perry displayed a badge showing he was an agent with the DEA, not the TSA, and specifically told Ramos-Burciaga that Greyhound does not screen passengers when they board. In fact, Agent Perry repeated the statement several times, telling Ramos-Burciaga that Greyhound "doesn't really have any security so we come down here and speak with passengers for security reasons" and "there's not really any security on the busses so basically you can

-12-

carry whatever you want on the bus." This evidence supports the district court's finding that Agent Perry's statements, including his response to her question,[4] did not deceptively convey to Ramos-Burciaga that she was required to speak to him before being permitted to board her bus to Denver.

Finally, Ramos-Burciaga argues she has limited proficiency in English, increasing the coerciveness of the encounter. The district court, however, listened to the recording of the encounter and found her responses and questions were appropriate and "indicate that she understood what she was being asked." Ramos-Burciaga does not identify any portion of the conversation demonstrating this finding is clearly erroneous and the transcript does not support her assertion she was "struggling to grasp what agents were saying and to respond appropriately." Appellant's Opening Br. at 13.

Having determined that none of the district court's factual findings are clearly erroneous, we apply those findings to conclude Ramos-Burciaga was not

---

[4] The audio recording of the encounter was transcribed by the government. Ramos-Burciaga argues she asked Agent Perry, "What happened that I was stopped?" but the transcript incorrectly indicates the second portion of her question was unintelligible. The district court stated "[t]he audio recording of what [Ramos-Burciaga] said is not clear, and it is difficult to discern what [she] said after 'what happened.'" Based on that uncertainty and Agent Perry's testimony that he did not recall Ramos-Burciaga asking if she was stopped, the district court declined to find that Ramos-Burciaga asked why she was stopped. In evaluating her claim that Agent Perry's response to her question led her to believe she was not free to leave, the district court assumed, but did not find, that Ramos-Burciaga asked why she was stopped.

seized. Based on the relevant circumstances, no reasonable person in her position would believe she was not free to terminate the encounter. Agent Perry approached her in a public place with other people present[5]; he spoke calmly and asked Ramos-Burciaga for permission to speak to her rather than demanding that she interact with him; Agent Perry and Agent Pantoja were in street clothes, did not display any weapons, and did not touch Ramos-Burciaga or make threatening gestures; neither Agent Perry nor Agent Pantoja impeded Ramos-Burciaga's movement; Agent Perry truthfully told Ramos-Burciaga he was conducting a security check because Greyhound does not check passengers' possessions before they board the busses; and there was no language barrier preventing Ramos-Burciaga from understanding Agent Perry's questions and explanations.

Only two relevant factors lean in Ramos-Burciaga's favor: Agent Perry did not tell her she was free to leave and more than one officer was present during the encounter. But these factors, when considered with all the others, provide only weak support for her position. *See United States v. Thompson*, 546 F.3d 1223, 1228 (10th Cir. 2008) (holding the failure to inform a defendant of her right to terminate the encounter "carr[ies] little weight in our analysis"); *United*

---

[5] *See United States v. Thompson*, 546 F.3d 1223, 1227 (10th Cir. 2008) ("Both the Supreme Court and this Court have held that the presence of other citizens during a police encounter is one factor suggesting its consensual nature.").

*States v. Benard*, 680 F.3d 1206, 1211 (10th Cir. 2012) (concluding the presence of two officers did not create a coercive environment when the encounter "occurred on a public street in broad daylight"). Accordingly, we affirm the district court's ruling that Ramos-Burciaga was not seized at any time before her arrest.

### B. Consent to Search

Ramos-Burciaga also argues the consent she gave to search her backpack was not voluntary. Although a warrant is generally required before officers may conduct a search, no warrant is necessary if the owner of the property voluntarily consents. *Florida v. Jimeno*, 500 U.S. 248, 250–51 (1991). "[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). The district court's finding of voluntariness is reviewed for clear error. *United States v. Thompson*, 524 F.3d 1126, 1133 (10th Cir. 2008).

> Factors to consider within the federal totality of the circumstances test include physical mistreatment, use of violence, threats, promises, inducements, deception, trickery, or an aggressive tone, the physical and mental condition and capacity of the defendant, the number of officers on the scene, and the display of police weapons. Whether an officer reads a defendant his Miranda rights, obtains consent pursuant to a claim of lawful authority, or informs a defendant of his or her right to refuse consent, also are factors to consider in determining whether consent given was voluntary under the totality of the circumstances.

*United States v. Sawyer*, 441 F.3d 890, 895 (10th Cir. 2006) (citations omitted).

As we have already concluded, the encounter occurred in a public place and Agent Perry did not threaten Ramos-Burciaga, deceive her, use an aggressive tone, or display his weapon during the encounter. The district court's finding that Ramos-Burciaga's identification and bus ticket were returned to her immediately is not challenged. We have further concluded Ramos-Burciaga was not seized at the time she gave her consent for Agent Perry to search her backpack and, thus, the consent was not tainted by an illegal seizure. *Cf. United States v. Contreras*, 506 F.3d 1031, 1037 (10th Cir. 2007) ("[D]etention is only one factor to be considered in determining whether consent was voluntarily and freely given based on the totality of the circumstances."). Her remaining argument—that Agent Perry coerced her into consenting by persistently requesting permission to search her luggage—is belied by the transcript of the encounter.

Agent Perry asked Ramos-Burciaga twice if he could search her backpack; both times she responded by asking him why he wanted to search. Each time Agent Perry truthfully told her his objective was to make sure she did not have "anything illegal" in the backpack. The district court acknowledged Ramos-Burciaga "twice declined to consent to his search of the backpack," but also found "she did not answer his first two requests to search her backpack." Agent

Perry then asked Ramos-Burciaga if she would open the backpack herself and allow him to view its contents. She responded, "Yeah, sure." Based on these facts, the district court found Agent Perry did not coerce Ramos-Burciaga into opening the backpack herself and showing him its contents when he proposed that approach.

Under all the circumstances, as set out above, there is no clear error in the district court's finding that Agent Perry's "alternative request for [Ramos-Burciaga] to open her backpack did not become coercive." Ramos-Burciaga agreed without hesitation to open the backpack herself when Agent Perry proposed this approach, despite previously questioning Agent Perry when he asked to open it himself. This is not a situation where Ramos-Burciaga clearly expressed her desire not to cooperate by resisting persistent demands from Agent Perry. *See Donahue v. Wihongi*, 948 F.3d 1177, 1195 (10th Cir. 2020). Having reviewed the entire record in light of the relevant circumstances, we discern no reversible error in the district court's finding that the government met its burden of showing Ramos-Burciaga voluntarily consented to the search of her backpack.

## IV. Conclusion

We **affirm** the district court's ruling that Ramos-Burciaga voluntarily consented to the search of her backpack during the course of a consensual encounter.

                                        ENTERED FOR THE COURT

                                        Michael R. Murphy
                                        Circuit Judge